UNITED STATES of America,
Plaintiff-Appellee,

v.

Alion ANDERSSON,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles W. HINCK,
Defendant-Appellant.

Nos. 84–1366, 85–1330.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1986.

Decided April 3, 1987.
As Amended May 22, 1987.

Leland B. Altschuler, San Jose, Cal., for plaintiff-appellee.

Doron Weinberg and Nina Wilder, San Francisco, Cal., for defendant-appellant.

Before HUG, BEEZER and KOZINSKI, Circuit Judges.

HUG, Circuit Judge:

In this consolidated appeal, Alion Andersson and Charles W. Hinck appeal their convictions of conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982) ("Count One"), possession of 21 kilograms of cocaine with intent to distribute ("Count Two"), and distribution of four kilograms of cocaine ("Count Three"). They argue that (1) the warrantless search of a hotel room containing the cocaine was improper; (2) the trial court erroneously admitted hearsay evidence of a coconspirator's statement; (3) the trial court erred in permitting two witnesses to testify as experts; and (4) the Government did not comply with the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 25 (1963) and the Jencks Act, 18 U.S.C. § 3500 (1982). They also appeal their sentences on the grounds that under *United States v. Palafox*, 764 F.2d 558 (9th Cir.1985) (en banc), they could not be sentenced to separate terms for distribution of a cocaine sample and possession with intent to distribute the remainder.

## I. FACTS

To summarize, this case concerns the arrest of several individuals involved in a cocaine transaction. Andersson and Hinck allegedly brought the cocaine to a hotel near the San Francisco airport, where they gave it to others who attempted to sell the cocaine to an undercover narcotics agent. While the actual negotiations took place, Andersson and Hinck left the hotel and

drove around nearby streets. Before the sale was completed, federal and San Mateo County officers arrested all of the defendants almost simultaneously.

The evidence, viewed in the light most favorable to the Government, revealed the following details concerning the drug transaction. Fred Mirgoli, a drug dealer turned Drug Enforcement Agency ("DEA") informant, asked Shahab Gousheh, a heavy cocaine user to whom he had formerly supplied drugs, if Gousheh knew of a dealer who could supply cocaine to a buyer Mirgoli knew. Gousheh contacted Craig Daniels and Andrew Smith, and eventually they agreed to supply Mirgoli with 21 kilograms of cocaine. Daniels and Smith checked into the Burlingame Sheraton Hotel near the San Francisco airport. Mirgoli checked into the nearby Hyatt Hotel and then went to the Sheraton to discuss the upcoming deal with Daniels, Smith, and Gousheh.

At 10:45 p.m., Daniels telephoned Mirgoli and told him to come to the Sheraton. When Mirgoli arrived, Daniels told him that the delivery would be made at the Hyatt in approximately 20–25 minutes, or about 11:30 p.m. Mirgoli and Gousheh left for Mirgoli's room at the Hyatt; Daniels and Smith also went to the Hyatt, to Room 327, which Smith had checked into earlier.

In the meantime, at 11:00 p.m., federal agents and San Mateo County Sheriff's investigators observed Andersson and Hinck rent a white Cadillac at the San Francisco airport. They followed the car to the Hyatt's parking lot, where, at 11:15 p.m., the investigators saw Andersson and another man take a suitcase, which was later discovered to contain six kilograms of cocaine, into the first floor corridor of the hotel. Room 327 was on this corridor. One person then returned to the car and, after a short conversation, Hinck and perhaps a fourth occupant got out of the car, took out a second suitcase, which was later found to contain eight kilograms of cocaine, and also entered the first floor corridor. After five or ten minutes, or at approximately 11:30 p.m., the investigators saw Andersson and Hinck return to the car

and drive away. The agents then saw Smith carry two suitcases from the first to the second floor of the hotel.

At approximately 11:30 p.m., Daniels called Mirgoli and told him to "come to the party." When Mirgoli and Gousheh arrived at Room 327 at 11:45 p.m., they found Daniels alone in the room. Shortly thereafter, Smith arrived with the first suitcase. He then left again and returned with the second suitcase. At approximately midnight, Mirgoli received two kilograms of cocaine and left, ostensibly to have it tested. Then, Smith once again carried the two suitcases to the second floor.

Meanwhile, investigators Alvarez and Young had been following the white Cadillac. Andersson and Hinck drove to a warehouse, which Andersson used for his business. Andersson entered the warehouse and after approximately five minutes, he emerged with an athletic bag. Andersson and Hinck then returned to the Hyatt sometime after midnight and were seen carrying the bag into the hotel. Later, the athletic bag was found in Room 327 and it contained a cash-counting machine. The investigators saw Andersson, Hinck, and a third man emerge from the hotel, shake hands, and Andersson and Hinck again drove off; the third man returned to the hotel. Andersson and Hinck then drove around nearby areas until they returned to the vicinity of the Hyatt shortly after 1:00 a.m.

After leaving Room 327 at midnight, Mirgoli had turned the "samples" over to government agents at approximately 12:15 a.m. Because the agents did not know which room on the second floor was the "stash room," Mirgoli called Daniels in Room 327 to ask for additional "samples," in order to give the agents another chance to observe Smith's trips to the second floor. A government agent then saw Smith in the vicinity of Room 414. After reviewing the registration cards for several rooms, he decided, based on an incomplete registration card and the fact that the room had been paid for in cash, that Room 414 was probably the "stash room."

Mirgoli returned to Room 327 at approximately 1:00 a.m., where Daniels was arrested at 1:15 a.m. Shortly thereafter, Smith, who had been seen walking into Room 414, left this room with Gousheh for the lobby, where they were arrested at 1:25 a.m. At 1:29 a.m., agents knocked on the door of Room 414; when they received no response, they used a passkey to enter the room. There they found James Dorn, and two suitcases, one of which was open and contained approximately six kilograms of cocaine. Dorn was arrested and they then opened the second suitcase and discovered an additional eight kilograms of cocaine. In the meantime, Andersson and Hinck had been arrested near the Hyatt at approximately 1:20 a.m.

A Federal Grand Jury indicted Andersson, Hinck, Gousheh, Daniels, Smith, and Dorn on three counts: (1) conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982); (2) possession of 21 kilograms of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982); and (3) distribution of four kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) (1982).

Shortly before trial began, on October 1, 1984, Daniels, Smith, Dorn, and Gousheh, through plea bargains, entered guilty pleas. Gousheh later agreed to testify for the Government. On October 16, the jury convicted Andersson and Hinck on all counts. Andersson received the following consecutive sentences: Count One (conspiracy): four years' imprisonment, three years' special parole, $25,000 fine; Count Two (possession with intent to distribute): four years' imprisonment, three years' special parole, $25,000 fine; Count Three (distribution): two years' imprisonment, three years' special parole, $25,000 fine. Hinck was sentenced to five years' imprisonment on each count, to run concurrently, to three years' special parole, and was not fined.

## II. THE SEARCH OF ROOM 414 AND THE CLOSED SUITCASE

Andersson and Hinck contend that the warrantless search of Room 414 was not justified by exigent circumstances, and that the search of the closed suitcase, which contained approximately half of the cocaine seized, was also illegal. The Government disputes these contentions and also argues that appellants do not have standing to raise these issues on appeal.

### A. Standing

The Government argues that appellants do not have standing to challenge the search of Room 414 because they did not demonstrate either ownership or a reasonable expectation of privacy and thus did not meet their burden of proof under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Appellants argue that under *United States v. Perez*, 689 F.2d 1336 (9th Cir.1982), they have standing to challenge the search.

The Supreme Court in *Rakas* noted that the inquiry is more accurately focused upon whether a particular defendant's own Fourth Amendment rights have been violated as a part of the merits of defendant's claim rather than on a concept of "standing." 439 U.S. at 138–39, 99 S.Ct. at 427–28.

The motion to suppress was made by defendant Dorn, who rented the room and clearly had a reasonable expectation of privacy in it. Andersson and Hinck merely joined in that motion. In that context, the district court did not deal with the issue of whether Andersson and Hinck had a reasonable expectancy of privacy in the room. It ruled on the justification for the warrantless search of the room and the suitcase and concluded that the searches were justified. Because we affirm the conclusion of the district court on that basis, we need not consider the issue of whether Andersson and Hinck had a legitimate expectation of privacy.

### B. Room 414

A warrantless entry into a hotel room must be justified by exigent circumstances. *United States v. Alfonso*, 759 F.2d 728, 742–43 (9th Cir.1985); *United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir.1983). Exigency has been defined as those circumstances that would cause a reason-

able person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.

*Alfonso*, 759 F.2d at 742 (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.)(en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). This court reviews the trial court's determination of exigent circumstances *de novo*. *McConney*, 728 F.2d at 1204–05.

■ In essence, Andersson and Hinck argue that there were no exigent circumstances justifying the warrantless entry into Room 414; or, alternatively, if such circumstances did exist, they were created by the agents themselves. Specifically, they contend that the agents knew the location of the cocaine "hours" before they entered Room 414.

The Government first learned that the sale would take place in the Sheraton at 10:45 p.m., when Daniels called Mirgoli. However, at that point, the room identified was Room 327, not Room 414. The agents did not learn the location of the "stash room" until sometime after midnight, when Agent Dershaw saw Smith in the vicinity of Room 414 and checked the registration cards for the second floor rooms. In the meantime, Daniels and the others in Room 327, the "sale room," were waiting for Mirgoli to return and inform them whether the sale would be consummated. Thus, the agents had only a short time in which to decide whether to arrest the defendants and search the hotel rooms. In fact, the first arrest, that of Daniels, occurred at 1:15 a.m., and agents entered Room 414 at 1:29 a.m.

As the Government points out, other factors also show the existence of exigent circumstances. First, the agents were uncertain as to the number of individuals involved. It was reasonable to assume that unknown individuals were guarding the cocaine in Room 414, thus raising the possibility that these individuals might become alarmed when the others did not return and either destroy the evidence or escape. In fact, a hitherto unidentified individual, James Dorn, was found in Room 414. *See, e.g., Alfonso*, 759 F.2d at 742–43. Second, the fact that the arrests occurred in a hotel raised legitimate concerns for the safety of the other guests. Given these factors, we find that exigent circumstances justified the entry into Room 414.

Appellants contend that, at a minimum, the agents should have obtained a telephonic warrant. In *United States v. Manfredi*, 722 F.2d at 522, we held that, in order to carry its burden of showing exigent circumstances, the Government must demonstrate "that a warrant could not have been obtained in time even by telephone under the procedure authorized by Fed.R.Crim P. 41(c)(2)." *See also United States v. Alvarez*, 810 F.2d 879, (9th Cir.1987). Such a warrant "may not be obtained simply by calling a magistrate.... '[A] duplicate original warrant' must be prepared in writing and read to the magistrate verbatim." *Manfredi*, 722 F.2d at 523 (citations omitted). Further, the agents were involved in a rapidly unfolding series of events. Although the Government failed to introduce evidence regarding the time required to obtain a telephonic warrant, we conclude that based on the circumstances presented in this case it is clear that the time required was not available. *See id.*

**C. *The Suitcase***

■ When the agents entered Room 414, they found James Dorn standing next to a bed upon which rested two suitcases. One of the suitcases was open and contained cocaine. After arresting Dorn, the agents opened the other suitcase and found additional cocaine. Appellants contend that the search of the second suitcase was illegal.

"[A] police officer may, incident to a lawful arrest, conduct a contemporaneous warrantless search of the arrestee's person and of the area into which the arrestee might reach to retrieve a weapon or destroy evidence.... Containers found within that area may also be searched contemporaneously with the arrest." *United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir.) (citations omitted), *cert. denied*, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983). Here, we find that the agents had probable cause to arrest Dorn. Thus, un-

der *Burnette* and *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the agents could search both Dorn and the immediate area, including containers, as a search incident to arrest, as long as the search of the suitcase occurred at about the same time as the arrest. Although appellants argue that the search of the suitcase did not occur until considerably after Dorn's arrest and, thus, under *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), a warrant was required, they offered no evidence to support this contention and none is contained in the record. Therefore, we find that the search of the second suitcase was proper.

## III.  THE DANIELS STATEMENT

During most of the night's events, Gousheh was in Room 327 with Daniels. When Gousheh heard Andersson and Hinck, who had returned to the Hyatt with the cash-counting machine, knock on the door, he went first into the bathroom to freshen up and then returned to the bedroom area. Daniels briefly introduced Gousheh to Andersson and Hinck, and then Daniels accompanied them back to the white Cadillac. When Daniels returned to Room 327, Gousheh asked Daniels what was going on. According to Gousheh's testimony, Daniels replied: "Nothing. They just want to know if he's doing O.K. or if everything is going O.K." Andersson and Hinck argue that Gousheh's testimony about Daniels's statement was improperly admitted under Federal Rule of Evidence 801(d)(2)(E) and also violated their rights under the Sixth Amendment's Confrontation Clause.

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Before a statement may be admitted, the proponent must show: "(1) that the declaration be in furtherance of the conspiracy; (2) that the declaration be made during the course of the conspiracy; and (3) that there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant with it." *United*

*States v. Perez*, 658 F.2d 654, 658 (9th Cir.1981). Appellants do not dispute the latter two elements, arguing only that the statement was not made in furtherance of the conspiracy.

We review a trial court's finding that statements were made "during the course of" and "in furtherance of" the conspiracy under the clearly erroneous standard. *United States v. Smith*, 790 F.2d 789, 794 (9th Cir.1986).

We have, on many occasions, sought to define the "in furtherance of" requirement. We have stated that "mere conversations between co-conspirators" or "merely narrative declarations" are not admissible as statements in furtherance of a conspiracy.... Instead, the statements must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]."

*United States v. Layton*, 720 F.2d 548, 556 (9th Cir.1983) (quoting *United States v. Fielding*, 645 F.2d 719, 726 (9th Cir.1981)), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). In determining whether a statement tends to further the objectives of the conspiracy, the statement should be examined in the context in which it is made. *Id.* at 557. Specifically, we have held that "statements made to keep a conspirator abreast of a co-conspirator's activities, or to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator are in furtherance of a conspiracy." *Id.* While appellants contend that Daniels's statement was not intended to reassure Gousheh or to induce his continued participation in the conspiracy, it falls squarely within the "keep a conspirator abreast of a co-conspirator's activities" language in *Layton*, and thus is admissible under Rule 801(d)(2)(E). Keeping Gousheh abreast of the coconspirator's activities was in furtherance of the conspiracy because the record reveals that Gousheh had a continuing role in the conspiracy—the exchange and the counting of the money.

This raises the question of whether, by meeting the requirements of Rule 801(d)(2)(E), Daniels's statement also sur-

vives a challenge under the Sixth Amendment's Confrontation Clause. In *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), the Supreme Court held, "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.'" However, in *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 1129, 89 L.Ed.2d 390 (1986), the Court held that the Confrontation Clause does not require a showing of unavailability as a condition to the admission of the out-of-court statements of a coconspirator. The Court did not address the question of whether the coconspirators exemption of Rule 801(d)(2)(E) satisfies the reliability requirement. *Id.* at 1124 n. 3, 1129 n. 1 (Marshall, J., dissenting). Here, appellants argue that Gousheh's testimony should not have been admitted because it was not reliable. The Government argues, first, that reliability may be inferred when a statement is admissible under Rule 801(d)(2)(E); and, second, that even if reliability must be shown, Gousheh's testimony meets the criteria for admission of a coconspirator's statement set forth in *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

With regard to its first argument, the Government asserts that the Court's statement in *Roberts* that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception" should apply here. 448 U.S. at 66, 100 S.Ct. at 2539. That is, once a coconspirator's statement has been shown to meet the requirements of Rule 801(d)(2)(E), a court need not consider the reliability question further.[1] However, *Roberts* involved the prior testimony of an unavailable witness who had been called by defense counsel and examined at a prelimi-

nary hearing, not the statement of a coconspirator. Our circuit has held that satisfaction of Rule 801(d)(2)(E) does not automatically satisfy the indicia of reliability requirement. Thus, we continue to use the *Dutton* factors in determining whether the statements of a coconspirator should be admitted. *See, e.g., Tille*, 729 F.2d at 621; *United States v. Fleishman*, 684 F.2d 1329, 1339 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *Perez*, 658 F.2d at 660–61.

The four factors to be considered under *Dutton* are:

> (1) whether the statements are assertions of past fact, (2) whether the declarant had personal knowledge concerning the crime, (3) the possibility of faulty recollection, and (4) whether the circumstances suggest that the declarant misrepresented the defendant's role.... All four indicators need not be present.

*Tille*, 729 F.2d at 621 (citations omitted). Here, Daniels's statement was an explanation of appellants' presence, rather than a statement of past fact. Further, Daniels certainly had personal knowledge of the cocaine sale, and had no apparent reason to misrepresent appellants' roles in the transaction to Gousheh. Appellants argue that the third factor, the possibility of faulty recollection, is at issue here because Gousheh had been drinking for most of the afternoon and evening and had admitted that he was not completely certain about what either he or Daniels had said. However, in determining reliability, we have given considerable weight to corroborative evidence. *Layton*, 720 F.2d at 561. Here, the testimony of the agents who observed appellants during the evening adequately supports a finding that appellants were, in fact, part of the cocaine sale. Thus, we find that admission of Gousheh's testimony

---

1. While a coconspirator's statement technically is excluded from the definition of hearsay under Fed.R.Evid. 801(d)(2)(E), rather than being classified as a hearsay exception, both the Supreme Court, in *Inadi* and *Dutton*, and this court apply a hearsay exception analysis, focusing on the necessity and reliability of the testimony. *See, e.g., United States v. O'Connor*, 737 F.2d 814,

819–20 (9th Cir.1984), *cert. denied*, 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985); *United States v. Tille*, 729 F.2d 615 (9th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984); *Layton*, 720 F.2d at 561. *But see United States v. Miller*, 771 F.2d 1219, 1233, 1235 (9th Cir.1985).

did not violate appellants' rights under the Confrontation Clause.

## IV. EXPERT TESTIMONY

Andersson and Hinck challenge the admission of certain testimony by Mirgoli and Alvarez as expert testimony. Under Federal Rule of Evidence 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education" may offer expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Admission of expert testimony is a matter within the broad discretion of the trial judge. *Fleishman*, 684 F.2d at 1335; *United States v. Binder*, 769 F.2d 595, 601 (9th Cir.1985). "The determination whether an expert witness has sufficient qualifications to testify is [also] within the district court's discretion." *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir.1984). "Law enforcement officers may testify concerning the techniques and methods used by criminals." *United States v. Rogers*, 769 F.2d 1418, 1425 (9th Cir.1985); *Fleishman*, 684 F.2d at 1335.

■ First, appellants argue that Mirgoli should not have been allowed to testify as an expert witness because he lacked sufficient expertise in drug operations. However, given Mirgoli's participation in over 50 similar drug sales, the district court did not abuse its discretion by finding that Mirgoli was qualified to testify about drug transactions. Appellants also contend that allowing Mirgoli to testify as an expert witness improperly buttressed his credibility by removing the "taint" of his status as a government informant. However, a review of the record shows that the trial judge properly instructed the jury that, because Mirgoli was a paid informant, his testimony should be considered with greater care than that given by an ordinary witness. Under these circumstances, we find that the trial court did not abuse its discretion in admitting Mirgoli's testimony about drug transactions.

■ Second, appellants argue that Alvarez should not have been allowed to testify that Andersson and Hinck engaged in "counter-surveillance techniques," *i.e.*, driving in a manner designed to determine if they were being followed, because the Government had not established that there was specific evidence that such driving techniques were associated with cocaine transactions. However, the record shows that the district court did have such evidence before it in this case. During the afternoon, Daniels had successfully eluded agents who were trailing him to the "stash house" in Woodside. Thus, the district court did not abuse its discretion in admitting Alvarez's testimony.

## V. BRADY AND JENCKS ACTS CLAIMS

Appellants first argue that the Government did not comply with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because it did not turn over Prosecutor Mendez's notes of his interview with Gousheh after the latter had decided to plead guilty. Appellants claim that these notes contain the information about the Daniels statement discussed in Part III above, which might have contained indications of prior inconsistent statements. Second, they contend that under the Jencks Act, 18 U.S.C. § 3500 (1982), the Government should have furnished appellants with copies of Agent Alvarez's field surveillance notes.

### A. *Mendez's Notes*

*Brady v. Maryland* requires the prosecution to disclose evidence that is both favorable to the accused and material either to guilt or punishment. 373 U.S. at 87, 83 S.Ct. at 1196; *see United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985). Impeachment, as well as exculpatory, evidence falls within *Brady's* definition of evidence favorable to the accused. *Bagley*, 105 S.Ct. at 3380. Such evidence is material, however, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine con-

fidence in the outcome." *Id.* at 3384; *see also Reiger v. Christensen,* 789 F.2d 1425, 1432 (9th Cir.1986); *United States v. Shaffer,* 789 F.2d 682, 687 (9th Cir.1986).

■ Here, the record shows that Gousheh spoke to government officials three times. First, shortly after his arrest, Gousheh was interviewed by a DEA agent. He did not mention the Daniels statement at that time. The DEA form recording this interview was turned over to appellants. Second, after he had decided to cooperate with the Government, Gousheh was interviewed by Mendez but did not discuss the Daniels statement. Gousheh was also interviewed by defense counsel at this time and did not mention the Daniels statement. Finally, shortly before he was to testify, Gousheh told Mendez about the Daniels statement. Mendez then informed both defense counsel and the court, which held a separate hearing in which defense counsel were allowed to cross-examine Gousheh about his expected testimony. During this hearing, defense counsel did not ask Gousheh about any prior statements he may have made to government officials. Given these circumstances, in which the Government promptly disclosed additional information to the defense and defense counsel were afforded an opportunity to examine Gousheh before his testimony was presented to the jury, we find that the Government complied with its obligations under *Brady.*

**B.** *Agent Alvarez's Notes*

■ While observing appellants' activities, Alvarez took four pages of notes, which apparently listed the sites visited by the white Cadillac after it left the Hyatt, but did not include the routes taken between the various destinations. He then turned the notes over to another agent, who wrote a report that did not include Alvarez's observations. This report was given to appellants. Sometime later, Alvarez prepared a supplemental report, also given to appellants, which listed the Cadillac's destinations but not the routes travelled. During this time, Alvarez's original notes were apparently lost. Appellants argue that the Government was obligated to produce Alvarez's notes under the Jencks Act, which requires that the Government produce any statements made by its witnesses after they have testified at trial.

In *United States v. Harris,* 543 F.2d 1247, 1253 (9th Cir.1976), this court held that under the Jencks Act, an agent's original interview notes with the suspect or potential witness must be preserved or produced. However, an agent's rough notes taken during the course of surveillance need not be preserved or produced. *United States v. Bernard,* 623 F.2d 551, 557–58 (9th Cir.1979); *see also United States v. Kaiser,* 660 F.2d 724, 731–32 (9th Cir.1981), *cert. denied,* 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 and 457 U.S. 1121, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982), *overruled on other grounds, United States v. DeBright,* 730 F.2d 1255 (1984) (en banc). Alvarez's notes fall within the *Bernard* rule. Thus, we find that the Government was not obligated to produce them after he had testified.

**VI. SENTENCES**

■ Appellants argue that the district court improperly imposed consecutive sentences for Count Two (possession with intent to distribute) and Count Three (distribution). They rely on *United States v. Palafox,* 764 F.2d 558, 560 (9th Cir.1985) (en banc), in which this court held that "where the defendant distributes a sample and retains the remainder for the purpose of making an immediate distribution to the same recipients at the same place and at the same time, verdicts of guilty may be returned on both counts but the defendant may be punished on only one." The *Palafox* rule applies to "single criminal undertaking[s] [in which] each offense is committed at virtually the same time, in the same place, and with the same participants...." *Id.* at 562.

The Government argues that the indictment in this case was drawn to reflect the two-step, two-level nature of the transaction and is different from the convictions in *Palafox.* The Government states that the appellants were charged with possession with intent to distribute a 21–kilogram bulk

amount of cocaine that was delivered to Daniels, and that they were charged with distribution of four kilograms of cocaine by Daniels to Mirgoli on a coconspirator theory. It contends that this case differs from *Palafox* because the possession and distribution to Daniels involved a different time, a slightly different place, and different participants. It cites *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 457–58 (9th Cir.1985), in support of this argument. There, a conviction and separate sentence for the distribution of a sample and a subsequent sale two days later was upheld.

In this case, it is clear that the coconspirators of Andersson and Hinck possessed 21 kilograms of cocaine in the hotel with the intent to distribute, and that they thereafter distributed a sample of four kilograms in the hotel with the intent of completing the sale of the 21 kilograms to the same customer, Mirgoli, at the same place, immediately after approval of the sample. The jury was properly instructed that Andersson and Hinck could be found guilty of those substantive crimes committed by their coconspirators in carrying out the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Indeed, the Government states that this was the basis for the conviction of distributing the four kilograms of cocaine. This could also form the basis for the jury's verdict on the charge of possession with intent to distribute the 21 kilograms of cocaine. Since the jury could have based its verdict on the coconspirators' possession, rather than any earlier possession by Andersson and Hinck, the sentence cannot be based upon the assumption that Andersson and Hinck were found guilty of personally possessing with intent to distribute the 21 kilograms of cocaine. Thus, we need not consider whether a conviction of such earlier personal possession and distribution by Andersson and Hinck would fall outside the holding of *Palafox*. When we view Andersson and Hinck's convictions for possession with intent to distribute the 21 kilograms and the convictions for distribution of the four kilograms as convictions for the substantive crimes committed by their coconspirators, it is

clear that *Palafox* applies. It is the same situation involved in *Palafox*—a distribution of a sample and retention of the balance of the drug to be sold immediately upon the approval of the sample.

■■■ Having determined that appellants are entitled to relief, we must consider what relief is appropriate. Each defendant is entitled to have the judgment of conviction and the sentence vacated and stayed on one of the two counts in accordance with *Palafox*. The Government contends that we should remand for resentencing in Andersson's case. Andersson argues that we should follow the procedure in *Palafox* and that we should simply remand with instructions that the district court vacate and stay the judgment of conviction and sentence on one of the two counts. *Palafox* involved the imposition of two concurrent five-year sentences for a single criminal undertaking. 764 F.2d at 559. Thus, by merely staying the imposition of sentence on one count, we left intact the same actual sentence to be served by the defendant. The same would be true in Hinck's case, as he received concurrent sentences on all counts. Thus, there would be no purpose to remand for resentencing. However, the practical effect in Andersson's case would be quite different. The sentence on Andersson's conviction on Count Two was four years' imprisonment, three years' special parole, and a $25,000 fine. The sentence on Count Three was two years' imprisonment, three years' special parole, and a $25,000 fine.

Similarly, in *United States v. Touw*, 769 F.2d 571 (9th Cir.1985), we could not leave the practical result of the district court's sentence intact by simply staying the sentence on one count. There we vacated the sentences and directed the district court to resentence on only one count. Consistent with *Touw*, we conclude that our supervisory powers under 28 U.S.C. § 2106 (1982) allow us to remand for resentencing on one of the two counts. *Cf. McClain v. United States*, 643 F.2d 911, 913–14 (2d Cir.), *cert. denied*, 452 U.S. 919, 101 S.Ct. 3057, 69 L.Ed.2d 424 (1981); *United States v. Busic*, 639 F.2d 940, 947–48 (3d Cir.), *cert.*

*denied,* 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981). Our conclusion is further supported by the fact that Andersson placed the entire judgment in issue by the inclusiveness of the notice of appeal. *See, e.g., United States v. Hagler,* 709 F.2d 578, 579 (9th Cir.), *cert. denied,* 464 U.S. 917, 104 S.Ct. 282, 78 L.Ed.2d 260 (1983).

■ Andersson further contends that resentencing is inappropriate when service of the sentence has already begun. Relying principally on *United States v. Best,* 571 F.2d 484 (9th Cir.1978), Andersson argues that the Double Jeopardy Clause prohibits such resentencing. In *Best,* we held that a valid sentence may not be increased after the defendant has commenced service. 571 F.2d at 486; *see also Kennedy v. United States,* 330 F.2d 26, 27–28 (9th Cir. 1964). Even assuming that Andersson has commenced service of a valid sentence on Count Two or Three, we conclude that this case is controlled by the Supreme Court's later pronouncements in *United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980).

The *DiFrancesco* Court held that the Double Jeopardy Clause did not prohibit the Government from appealing the defendant's "dangerous special offender" sentence. 449 U.S. at 138–42, 101 S.Ct. at 438–40. In determining this issue, the Court reviewed the history and purpose of the Double Jeopardy Clause. Several propositions emerged from this review:

This Court's decisions in the sentencing area clearly establish that a sentence does not have the qualities of constitutional finality that attend an acquittal....

The double jeopardy considerations that bar reprosecution after an acquittal do not prohibit review of a sentence. We have noted above the basic design of the double jeopardy provision, that is, as a bar against repeated attempts to convict,

with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent....

The Double Jeopardy Clause does not provide the defendant with the right to know at any specific moment in time what the exact limit of his punishment will turn out to be....

*Id.* at 134, 136, 137, 101 S.Ct. at 435, 437. Granting the Government the right to appeal did not violate the Double Jeopardy Clause's prohibition against multiple punishments and successive prosecutions following an acquittal. The Supreme Court ultimately concluded that since Congress specifically provided for the Government's appeal of the sentence, the defendant has no legitimate expectation of finality in the original sentence. *Id.* at 137–38, 101 S.Ct. at 437–38; *see also Pennsylvania v. Goldhammer,* 474 U.S. 28, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985).

Similarly, we conclude that Andersson has no legitimate expectation of finality in the original sentence when he has placed those sentences in issue by direct appeal and has not completed serving a valid sentence.[2] Further, resentencing here does not implicate concerns regarding multiple punishments or successive prosecutions. Our examination of *DiFrancesco* leads us to conclude that the Double Jeopardy Clause does not provide an absolute bar to the resentencing of Andersson here. *Accord United States v. Colunga,* 786 F.2d 655, 658–59 (5th Cir.1986); *United States v. Bello,* 767 F.2d 1065, 1070 (4th Cir.1985); *United States v. Jefferson,* 714 F.2d 689, 706–07 (7th Cir.1983), *overruled on other grounds, United States v. Markowski,* 772 F.2d 358 (7th Cir.1985), *cert. denied, —— U.S. ——,* 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986); *McClain v. United States,* 676 F.2d

**2.** Contrast *United States v. Arrellano-Rios,* 799 F.2d 520, 523–24 (9th Cir.1986), in which we held that the Double Jeopardy Clause prevented resentencing on two valid convictions after a third conviction was overturned on direct appeal. The basis for our holding was that the defendant had "fully served" legal sentences on the two valid convictions. In such circumstances, we held that the defendant has a reasonable expectation of finality and jeopardy has attached.

915, 917–18 (2d Cir.), *cert. denied,* 459 U.S. 879, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982); *Busic,* 639 F.2d at 948–52.[3]

The vacating of both sentences is particularly appropriate when, as here, there is not one legal and one illegal sentence. Rather, it is the coexistence of the two sentences which causes the illegality. Neither of the sentences has priority.

Therefore, we affirm Andersson's and Hinck's conviction on Count One. We remand the case to the district court with instructions:

1. In Hinck's case, to vacate the judgment of conviction on Count Two or Three and to stay the entry of judgment and imposition of sentence on the other. The stay is to become permanent upon the completion of the sentence on the remaining count.

2. In Andersson's case, to vacate the judgments of conviction on Counts Two and Three and to resentence on the two counts with the sentence on each to be no more severe than the combined sentence of Counts Two and Three. The judgment of conviction and imposition of sentence on one of the two counts shall be stayed. The stay is to become permanent upon completion of the sentence on the remaining count.

---

3. *But see United States v. Jones,* 722 F.2d 632, 638 (11th Cir.1983). The *Jones* court concluded that the defendant had an expectation of finality and jeopardy attached once he began serving his sentence. The court thus held that a sentence may not be altered thereafter unless the statute explicitly provides for modification or the de-fendant deceives the sentencing judge. *Id.* at 638–39. The circumstances in *Jones,* however, were materially different from those here. Jones had not appealed his convictions; rather, the district court had increased the original sentence *sua sponte* after discovering its own error.