**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James S. JENKINS,**
**Defendant–Appellant.**

**No. 87–3177.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 9, 1989.

Decided August 30, 1989.

Ronald H. Hoevet, Portland, Or., for defendant-appellant.

Charles W. Stuckey, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before BROWNING, WALLACE and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

In June of 1987, a jury returned a guilty verdict against James Jenkins on two counts of aiding and assisting the preparation of false income taxes. Jenkins was sentenced to three years in prison on Count I and five years probation on Count II. The district court conditioned probation on Jenkins' payment of $250,225.00 in restitution. Jenkins argues that the conviction should be reversed because (1) the district court improperly limited the scope of cross-examination of a leading prosecution witness, Bruce Schulte; and (2) the indictment was insufficiently specific. He also argues that the "restitution condition" on his probation is improper. We affirm the conviction, but vacate his sentence on both counts and remand for resentencing.

## I

In 1979, IRS Special Agent Checkwith began an investigation of the tax affairs of Bruce Schulte. The investigation focused on various foreign trusts Schulte was using as tax shelters.

According to the government, Schulte, his accountant (Jones), and Jenkins concocted a scheme to allow Schulte to offset the tax liability for 1979 resulting from the income from the foreign trusts. In 1980, Jenkins was selling distributorships of a "new" form of toilet (the Mediator toilet) as a tax shelter. On October 13, 1980, two days before the 1979 return was due, Jones, Jenkins and Schulte met. At that meeting, Schulte agreed to purchase the rights to distribute the Mediator toilet for $862,500, to be paid by two promissory notes. According to the government, Jenkins suggested to Schulte that the notes be back-dated so that it would appear that the investment was made in 1979 to enable Schulte to offset the trust income for 1979 with a loss. According to Jenkins, "it was Mr. Jones' idea to date the documents December 31, 1979" and Jenkins' purpose in agreeing to the back-dating was *not* to assist Schulte in avoiding tax liability for 1979.

Schulte served a one-year sentence for tax evasion. The record does not indicate what punishment, if any, Jones received. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

1. *Limitations on the Scope of Cross-Examination*

a. Standard of Review

■ Whether the district court has violated the confrontation clause is a question of law involving the accused's constitutionally guaranteed right to a fair trial and is reviewed de novo. *Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir.1980). Although our review is *de novo*, we nonetheless recognize that trial courts in the conduct of trials have considerable discretion as to what evidence they admit, what they exclude, and how and what questions may be asked provided a fair trial is had. *See United States v. McClintock*, 748 F.2d 1278, 1289 (9th Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985);

*United States v. Kennedy,* 714 F.2d 968, 973 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984). Because a district court has a good deal of discretion in limiting cross-examination, a reviewing court normally will hold that the district court violated the confrontation clause only if it concludes that the district court denied the jury "sufficient information to appraise the biases and motivations of the witness." *McClintock,* 748 F.2d at 1290. *Accord United States v. Jackson,* 756 F.2d 703, 707 (9th Cir.1985).

■ Once the reviewing court concludes that the district court violated the confrontation clause, it must decide whether the district court's error was harmless. Our prior circuit law expressed in *Chipman,* 628 F.2d at 533 ("Confrontation clause doctrine appears to require reversal if there is any error; whether the error was harmless in the particular case is not considered."), has been overruled by *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), in which the Supreme Court held that

> the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors ... [including] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Thus, "the extent of cross-examination otherwise permitted" is a relevant factor both in determining whether there was a confrontation clause violation and in determining whether any such violation was harmless.

**b. The Merits of Jenkins' Confrontation Clause Claim**

■ Jenkins argues that the district court violated his constitutional right to confront witnesses against him when it ruled that Jenkins' counsel could not inquire on cross-examination whether Schulte's sworn affidavit of January 8, 1986 was the product of coercion or duress. Paragraph 6 of this affidavit states in effect that Jenkins suggested to Schulte that he back-date the documents and that Jenkins explained that this back-dating would have the effect of wiping out Schulte's tax liability from his participation in the foreign trusts and would divert the IRS special agent investigating Schulte's involvement in those trusts.

During redirect examination, Schulte maintained that paragraph 6 of the affidavit, although "true conceptually," is "not true." Schulte then asked if he could ask the judge a question, and the judge dismissed the jury. While the jury was out, Schulte told the judge that "I am saying that statement was taken under duress. I will only tell you what was true. I cannot say they threatened me with perjury to put me in jail. I really don't know what to do." The judge then asked Jenkins' counsel to ask Schulte the questions he proposed to ask in front of the jury. During this questioning, Jenkins' counsel asked Schulte if Schulte had just said that the statements in the affidavit were the product of coercion and duress and Schulte answered "yes." The judge then questioned Schulte about the nature of the coercion and duress, presumably in order to get some sense of what Schulte meant by these words.

BY THE COURT

Q. When you speak of coercion and duress, Mr. Schulte, as being present in your mind as of the time you gave the statement, January 18, 1986, are you referring to some kind of threats that were then being made to you in so many words by Mr. Checkwick?

A. No, Your Honor. What I was referring to then I didn't realize, you know,

just when it was signed. I was [in my lawyer's office] Saturday. And I asked on these agreements. And we found the same day I was sentenced.

So what I am saying is I had a phone call will you meet me somewhere, I have a statement I want to go over with you. And I met Mr. Checkwick in a coffee shop. We just went over this agreement which he had already typed up and prepared. We made a few changes on it basically. And here it stands. I mean I didn't really have the time to review it. I didn't sit down and make the statements conceptually. I am saying everything here is the truth.

Q. Well, you were feeling under pressure at that time because your sentence was coming up?

A. That is right.

Q. I mean pressure from the sentence alone?

A. (No response.)

Q. That is true of anybody that is getting ready to be sentenced, isn't it?

A. That's true.

Q. But you were given an opportunity by Mr. Checkwick to object to various parts of it and to make corrections or to ask that corrections be made?

A. That is right. That is what we have done.

While the jury was still out, the district court ruled that Jenkins' lawyer (Mr. Hoevett) could not use the words "coercion" and "duress" during his cross-examination in front of the jury, but that he could inquire about the pressures Schulte was feeling on January 8:

THE COURT: ... I rule out the claim by way of exploration of coercion or duress that is implicit in—or explicit, I should say, in some of Mr. Hoevett's questions. I treat those questions as being proposed cross-examination and I rule that they are not entitled to be asked in the presence of the jury.

MR. HOEVETT: May I be allowed to inquire into the circumstances in which the statement was given; that it was given on the morning before he was to be sentenced?

COURT: ... yes, of course. If the course of the two events has not been earlier mentioned, of course, you can mention it....

MR. HOEVETT: ... I also think it proper cross-examination to suggest[ ], as anyone would, that Mr. Schulte felt some pressure on the morning he was to be sentenced to cooperate with Mr. Checkwick. I don't know if that is necessarily encompassed within the words "coercion" and "duress." Certainly he wasn't in a position to refuse a meeting with Mr. Checkwick because he knew he was looking for the Government to say something at the sentencing.

THE COURT: Well, anyone who is as skilled an advocate as you are can find other adjectives which approach the same concept as are embodied in the words "coercion" and "duress." And that one we will sort of have to play by ear I suggest to you because I have already told you I will allow you to connect up the two events. But I don't want you barging in with a direct question [on] coercion and duress.

Adjectives that you may choose to use —I'm not going to rule on them in advance. I simply say to you that I rule that out.

After the jury returned, Jenkins' counsel did in fact question Schulte at length about the pressures Schulte felt when he signed his affidavit of January 8.

Q. And [the affidavit] was signed the morning before you were to be sentenced in the coffee shop in the basement of this building?

A. This building or the federal building. I don't recall which.

Q. And two people were present; you and Mr. Checkwith?

A. Correct.

Q. Your lawyer wasn't there?

A. No....

Q. And at the time you executed this document did you know what sentence you were going to serve?

A. I had no idea.

Q. Okay. Did you know what the maximum exposure was?

A. Yes, I did. Five years.

Q. Okay, what sentence did you end up serving, Mr. Schulte?

A. One year....

Q. I am talking about your frame of mind when you were signing the document, you felt some pressure, did you not?

A. Correct.

Q. You felt some pressure from Mr. Checkwith because it was part of your plea agreement that you agreed to sit down with him and cooperate in their ongoing investigation, was it not?

A. That is true.

Q. And that was part of the things that you had to do in order to enter into the plea agreement you had previously signed?

A. Right.

Q. Now it's fair to say ... that the statements that are attributable to Mr. Jenkins in Paragraph 6 today you can't swear that those statements were made by Mr. Jenkins?

A. That is true.

Since Jenkins' lawyer was permitted to explore at length the pressures Schulte felt at the time he signed the affidavit and the jury thus had the benefit of considerable information with which to appraise Schulte's motivations in signing the affidavit, we conclude that the district court's prohibition on the use of the two words "duress" and "coercion" did not violate the confrontation clause. Although Jenkins apparently wishes that his lawyer had examined more exhaustively the pressures Schulte felt at the time he signed the affidavit, the district court's narrow ruling that Jenkins' lawyer could not use the words "coercion" and "duress" did not prevent him from conducting a more exhaustive examination. "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *See Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d

15 (1985) (per curiam) (emphasis in original).

Since the test for assessing whether a district court abused its discretion under Fed.R.Evid. 403 by limiting cross-examination is substantially the same as the test for assessing whether the district court violated the confrontation clause by limiting cross-examination, we also hold that the district court did not abuse its discretion under Rule 403. *See Lewy v. Southern Pacific Transportation Co.*, 799 F.2d 1281, 1298 (9th Cir.1986) ("[T]he Supreme Court and our court have held that while parties are usually entitled to introduce some evidence of witnesses' biases, courts have 'wide discretion' under Rule 403 to impose limits on the quantity and type of evidence that they introduce.... As long as a jury is provided 'sufficient information [overall] to appraise the bias and motives of [a] witness,' we have generally not found the trial court to have abused its discretion.") (footnote omitted).

### 2. *Sufficiency of the Indictment*

We review the sufficiency of an indictment de novo. *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir.1982), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983). Jenkins argues that the indictment is constitutionally insufficient and that the district court therefore erred in denying his motion to dismiss the indictment. The gist of Jenkins' argument is that the indictment failed to inform Jenkins of "the nature and cause of the accusation" in that it "does not mention in what manner the defendant willfully aided, assisted in and procured ... the preparation and presentation of the materially false returns in question."

It is clear that the Constitution does not require "[t]he government [to allege] its theory of the case or supporting evidence, but only the 'essential facts necessary to apprise a defendant of the crime charged.'" *Buckley*, 689 F.2d at 897 (citation omitted). *See also United States v. Markee*, 425 F.2d 1043, 1047 (9th Cir.1970) ("A distinction is to be drawn between an indictment which fails to set forth the essential facts necessary to apprise a defen-

dant of the crime charged and one which, though it specifies the necessary facts, fails to specify the theory upon which those facts will be proved at trial or the evidence upon which the proof will rest"). One of the purposes of the "essential facts" requirement is to ensure that defendant has "a description of the charges against him in sufficient detail to enable him to prepare his defense...." *United States v. Lane,* 765 F.2d 1376, 1380 (9th Cir.1985).[1]

The indictment in this case identified the date of the offense (October 13, 1980), the tax return, and the specific loss claimed on the return. The indictment also specified that Jenkins "did willfully aid and assist in ... the preparation" of a tax form claiming a loss that "the defendant then and there well knew and believed [Schulte] was not entitled to," but it does not state *how* Jenkins willfully aided and assisted Schulte. The relevant question, therefore, is whether the government's contentions regarding the manner in which Jenkins "aided and assisted" Schulte is an "essential fact" Jenkins needed to prepare his defense.

After reading the indictment, Jenkins should have known generally what he had to show by way of defense, i.e., that his conduct on October 13 with respect to Schulte's claimed loss of $862,500 did not violate the statutory prohibition against aiding tax fraud. While it might have been preferable for the government to specify the precise nature of Jenkins' misconduct (e.g., selling a "sham" distributorship, suggesting the back-dating of documents), Jenkins has failed to make a convincing argument that the lack of specificity in the indictment denied him the opportunity to prepare an adequate defense. We therefore hold that the indictment was sufficient.

### 3. *Restitution as a Condition of Probation*

#### a. The $250,225.00 condition

█ Although a court has broad discretion as to the conditions of probation it imposes, *United States v. Tolla,* 781 F.2d 29, 32 (2d Cir.1986), the conditions must be lawful. *See United States v. Green,* 735 F.2d 1203, 1205 (9th Cir.1984) (district court may not "exceed[ ] its authority" under Federal Probation Act). The district court made Jenkins' probation conditional on the payment of $250,225.00, which is the sum that a court in California awarded investors in Jenkins' "Mediator Toilet" business. The basis of the investors' suit against Jenkins apparently was fraud.

This condition on probation was outside the court's authority. Under the statutory provision applicable to offenses committed prior to November 1, 1987, 18 U.S.C. § 3651, the district court had the authority to require the defendant "to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had." The defrauded investors involved in the California civil suit did not suffer a loss "caused" by Jenkins' act of assisting Schulte in filing a fraudulent tax return. The $250,225.00 restitution condition is improper because that sum is not a "loss caused by the offense for which conviction was had."

#### b. The District Court's Authority on Remand

Since the restitution condition on probation was improper, we must remand for resentencing. The resentencing poses several questions. Can the district court enter a revised order of restitution? Can it impose a sentence of incarceration for Count II? Can it combine a sentence of incarceration on Count II with a modified restitution order? Can it resentence on Count I as well as Count II?

█ In *Green,* 735 F.2d at 1205, the court held that "[i]n criminal tax cases, the court may order restitution only for back-taxes for the years involved in the conviction." Although *Green* involved a convic-

---

1. Another purpose of the "essential facts" requirement is to ensure that the defendant will not be subjected to a second trial for the same offense. *Lane,* 765 F.2d at 1380. However, Jenkins "concedes that the indictment is sufficient under the double jeopardy clause of the Fifth Amendment...."

tion of a taxpayer, there is no reason not to extend its holding to cases of persons who assist taxpayers in filing fraudulent returns. Where a person assists a taxpayer in filing a fraudulent return, the aggrieved party is the United States government and the loss caused by the conviction is the unpaid tax liability.

This circuit has held that a district court is authorized to order restitution up to the amount of loss to aggrieved parties set forth in the indictment or in the plea agreement. Several decisions in this circuit also suggest that a court may fix restitution in an amount greater than the amount alleged in the indictment or plea agreement if the greater amount is "judicially established." *See United States v. Whitney*, 785 F.2d 824 (9th Cir.1986), *amended*, 838 F.2d 404, 405 (9th Cir.1988); *United States v. Schiek*, 806 F.2d 943, 945 (9th Cir.1986); *United States v. Black*, 767 F.2d 1334, 1343 (9th Cir.1985); *United States v. Gering*, 716 F.2d 615, 623 (9th Cir.1983). The rule that the amount of restitution may not exceed the sum set forth in an indictment, a plea agreement, or some formal judicial finding is designed to satisfy the "need [to] prove[ ] with certainty the amount of the loss caused by the offense." *Gering*, 716 F.2d at 625.

■ Jenkins did not enter into a plea agreement. The indictment states the amount of the loss that was fraudulently claimed on the tax return, but it does not state the amount of taxes Schulte avoided by claiming that loss. The district court below never "judicially established" the amount of taxes Schulte avoided by fraudulently claiming a $862,500 loss for 1979. Since the "amount of the loss" in this case was not established in an indictment, a plea agreement, or a formal judicial finding, we must address the question of whether the district court on remand may "judicially establish" the amount of loss. Since the purpose of the judicially-developed rules limiting the means by which district courts

may determine the amount of restitution is to ensure that "the amount of loss caused by the offense" is "proved with certainty," *Gering*, 716 F.2d at 625, and since the district court on remand surely could establish the amount of loss caused by Jenkins' offense "with certainty," we conclude that the district court on remand may "judicially establish" the amount of tax loss and then order a permissible amount of restitution. *See United States v. Weichert*, 836 F.2d 769, 772 (2d Cir.1988) (ordering the district court on remand to make a "judicial determination of the actual loss suffered by the crime's victims").

■ If the district court on remand "judicially establishes" the amount of tax loss, it then may order restitution up to that amount, *unless* either Schulte or Jones have paid all or part of the tax liability Schulte avoided by fraudulently claiming the $862,500 loss. Restitution for a monetary loss by definition should not exceed the total dollar amount of the loss. Thus, while co-participants in a criminal offense may be held jointly and severally liable for the loss to an aggrieved party (here, the United States government), *see United States v. Van Cauwenberghe*, 827 F.2d 424, 435 (9th Cir.1987), the United States government should not be permitted to collect more than its total tax loss as "restitution." In sum, the district court on remand may condition Jenkins' probation on the payment of at most the actual tax loss to the government.

A more problematic question is whether the district court on remand can impose an entirely new sentence for both counts or for Count II or whether it is limited to adjusting the restitution condition on Jenkins' probation. This court has never directly addressed the question of whether a district court may resentence a defendant after the court of appeals holds that the district court's condition on probation is improper.[2]

■ Jenkins argues that the double jeopardy clause prohibits the district court

---

2. In *Green,* the court stated that "[w]hen a court exceeds its sentencing authority, the sentence is void only as to the excessive portion of it. The remedy for imposition of a condition requiring excessive restitution is a reduction of restitution

to the amount authorized." *Green,* 735 F.2d at 1206 (citation omitted). However, the issue before the court was whether it could rely on the defendant's failure to pay the part of the restitution order that could have been lawfully im-

from resentencing him on remand. In *Kennedy v. United States,* 330 F.2d 26, 27 (9th Cir.1964), the court held that "the [district] court may not increase or make more severe the valid portions of the sentences originally imposed ... where, as here, service of the legal portions of the sentences has commenced."[3] Jenkins has been released on his own recognizance pending appeal. Thus, he has not commenced serving his sentence on either count. We therefore conclude that the double jeopardy clause does not bar the district court on remand from resentencing Jenkins on either or both counts.

■ We now address the argument that, because Jenkins challenged only the restitution portion of his sentence for Count II, we should remand only for modification of that portion of his sentence. The district court may have regarded the two components of the sentence for Count II (the five years of probation, the $250,-225.00 restitution order) as parts of a single "sentencing package." Since we must vacate the restitution order, the district court on remand should have the opportunity to reconsider the probation portion of its sentence for Count II. Moreover, since the two counts involve closely related misconduct, the district court also may have regarded the sentences for the two counts as parts of a single "sentencing package."[4] Therefore, the district court on remand also should have the opportunity to reconsider its sentence for Count I. *See United States v. Pinkney,* 551 F.2d 1241, 1246 n. 37 (D.C.Cir.1976) ("Where the appellate court could only speculate as to what sentence the trial court would have imposed absent consideration of a count upon which the conviction or sentence is later vacated, a remand for resentencing on the remaining, valid counts is appropriate.").

Of course, "upon remand the district court must resentence in accordance with the due process considerations enunciated by the Supreme Court in *North Carolina v. Pearce.*" *United States v. Hawthorne,* 806 F.2d 493, 501 (3d Cir.1986). See also *North Carolina v. Pearce,* 395 U.S. 711, 725–26, 89 S.Ct. 2072, 2080–81, 23 L.Ed.2d 656 (1969).

We affirm the conviction of Jenkins, but vacate his sentence for Counts I and II and remand for resentencing.

WALLACE, Circuit Judge, concurring:

I concur in the result and join parts I and II.1. through II.3.a. I decline to join part II.3.b. because it is not needed for disposing of the issues presented to us.

Having concluded that the district court's restitution condition was improper, this court should simply remand for resentencing. Instead, the majority poses and then answers four hypothetical legal questions which the district court might never face in resentencing Jenkins. *See* Maj. Op. at 439. On remand, the district court might decide to impose a nonmonetary condition of probation on Count II. It might impose a new order of restitution, but the defendant might not appeal. In either case, the majority's discussion of available options would be superfluous. In addition, I suggest that ordinarily the district judge on remand, who is more fully advised by specific arguments of counsel, is better situated to make an informed determination than is an appellate court answering its own hypothetical questions.

---

posed as a basis to revoke probation. Resentencing was not an issue. The opinion cannot be fairly read as limiting the court's resentencing authority and to do so would conflict with *Kennedy v. United States,* 330 F.2d 26 (9th Cir. 1964).

**3.** Relying on the Supreme Court's subsequent opinion in *United States v. DiFrancesco,* 449 U.S. 117, 138–42, 101 S.Ct. 426, 438–40, 66 L.Ed.2d 328 (1980), the court in *United States v.*

*Anderson,* 813 F.2d 1450, 1461 (9th Cir.1987), concluded that a defendant who appeals his sentence "has no legitimate expectation of finality in the original sentence when he has placed those sentences in issue by direct appeal and has not completed serving a valid sentence."

**4.** Both counts allege that on October 13, 1980 Jenkins assisted Schulte in fraudulently claiming losses on his tax return.