BOOCHEVER, Circuit Judge:
 

 David Bensimon was convicted in federal district court of conspiracy in violation of 21 U.S.C. § 846, and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a). On appeal, Bensi-mon argues that the district court erred by allowing the government to impeach him with evidence of his seventeen-year-old conviction for mail fraud. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand for a new trial.
 

 BACKGROUND
 

 On October 9, 1996, U.S. Customs inspectors examined a shipment of 1,500 cartons of glass blocks arriving in Florida from Venezuela, and found cocaine hidden in 51 of the cartons. The shipment was consigned to “Black Sea Enterprises, C/O Hussein Saleh,” with Long Beach, California as the ultimate destination. Customs agents sent the shipment to Long Beach in anticipation of a controlled delivery. On October 10, in California, Rudolf Kogan began making arrangements for the shipment to clear customs. He visited two customs brokers near Los Angeles International Airport, and representing himself to be “Hussein Saleh,” provided the brokers with a Social Security number and a business card belonging to Saleh. Kogan then signed over a power of attorney authorizing the broker to conduct business on Saleh’s behalf. Kogan also hired a truck driver to transport the shipment to a warehouse in the San Fernando Valley once it arrived.
 

 On October 19, the container arrived at the rail yard in Long Beach. The agents sprayed the boxes containing cocaine with an invisible powder that becomes fluorescent when exposed to infrared light. On October 22, Kogan and Bensimon met a truck driver at the rail yard. Kogan and Bensimon were both seen to go into the rail yard offices, and were told that the shipment had been cleared. After the truck picked up the shipment, Bensimon got in his pick-up truck and drove off. Kogan got in his car and led the truck carrying the shipment to a warehouse in Van Nuys. Bensimon arrived at the warehouse soon thereafter.
 

 The next day, hired laborers unloaded the glass blocks. The windows of the warehouse had been covered with butcher block paper so that no one could see inside. After the laborers left, Bensimon and Kogan stayed in the warehouse for a
 
 *1124
 
 short while, then locked the warehouse and drove away. They drove only a short distance before being arrested. Bensimon and Kogan both had fluorescent powder on their hands. The agents took the keys to the warehouse from Bensimon, and conducted a protective sweep of the warehouse before locking it up for the night. There was testimony that the agents did not handle or touch the glass blocks.
 

 The next day, the government executed search warrants for the warehouse and the two vehicles belonging to Kogan and Ben-simon. The warehouse was empty except for a phone, a fax machine, and the glass block shipment. Some of the flaps to the cartons containing the cocaine had been opened the day before. Inside Bensimon’s pick-up truck, agents found an illegally cloned cellular telephone which previously had been used to call Kogan and the customs broker. The agents also found a leather briefcase belonging to Bensimon containing numerous documents relating to Saleh and Black Sea Enterprises. The agents searched Bensimon’s home the following day, and seized tax and bankruptcy records.
 

 Bensimon and Kogan were charged in a two-count indictment alleging conspiracy and possession of cocaine with intent to distribute. At trial, Bensimon testified that he did not know that cocaine was contained in the shipment, but thought .he was merely helping his business associates import glass blocks. Bensimon was convicted on both counts in the indictment. Bensimon’s co-defendant, Kogan, who did not testify, was acquitted on both counts. Bensimon filed this timely appeal.
 

 DISCUSSION
 

 I.
 
 Bensimon’s Seventeen-Year-Old Mail Fraud Conviction
 

 Prior to trial, the government moved in limine under Federal Rule of Evidence 609(b) to admit as impeachment evidence Bensimon’s seventeen-year-old conviction for mail fraud. The district court denied the motion because the prior conviction was just “too old and not sufficiently critical” to have much probative- value. The court added that it was “not a great fan of prior felony convictions ... as bearing upon credibility, and this one doesn’t seem to have a lot, logically, to do with credibility.” The district court made the ruling without prejudice . subject to Bensimon’s testimony, but it warned the government “not to have too much hope” that it would be admitted. Later at the pretrial status conference, the. district court again explained that it did not think the seventeen-year-old conviction was relevant because of its age, but again made the ruling subject to Bensimon’s testimony. The court stated that it would admit the prior conviction if, for example, Bensimon testified he was a law-abiding citizen, and had been all of his life.
 

 At trial, Bensimon testified that in 1996, he agreed to help two business associates, Amnon Mizrahi and Hussein Saleh, import glass blocks from Venezuela to the United States, but he had no knowledge of any cocaine. At the time, Bensimon was operating a successful seafood import business. Bensimon testified that on the day the shipment was delivered to the warehouse, he left the rail yard and met with Saleh, who gave him the keys to the warehouse and money to pay the laborers to unload the shipment. Saleh also asked Bensimon to pick up a “DHL” envelope sitting on the desk in the warehouse.
 
 [1]
 

 Bensimon spent much of his testimony denying that any incriminating documents were found in his briefcase. Instead, he testified that those documents were actually contained in the DHL envelope he had picked up for Saleh at Saleh’s request. The only documents in his briefcase, he claimed, were related to his seafood importing business. This testimony was in direct conflict with that of customs agents who stated that they found incriminating documents in Bensimon’s briefcase. Ben-simon also made passing references to the fact that he observed religious holidays,
 
 *1125
 
 had served in the Israeli army, and was married with two children.
 

 After Bensimon finished his direct testimony, the government renewed its request to impeach Bensimon with his prior mail fraud conviction, arguing that impeachment was necessary given the significant conflict between Bensimon’s and the agents’ testimonies. The district court denied the request, stating simply, “the mail fraud conviction, that is out.” Midway through Bensimon’s cross-examination, however, the district court reconsidered its ruling and admitted the mail fraud conviction under Rule 609(b). The court provided the following explanation:
 

 I have refused all along to let the Government use this. I’m not a great devotee of prior felony convictions — and this one is quite old — and it would take an extreme situation for me to permit it, but I think this case presents that situation.
 

 Here is a case where the defendant has constructed a picture of himself as a law-abiding citizen, a husband, father, religious Jew, Army veteran, successful businessman, all of which extends over many years. He’s placed his testimony in direct [conflict] with the officer who says that he found the incriminating material in his briefcase. That turns out to be an important point. So his credibility is very much on the line.
 

 And here’s a man who can’t remember or even approximate what his earnings were in recent years, even though some of the returns would indicate that his years were disastrous; and then he hedges even on the question of where he was last year. He can’t remember if he went to Belgium last year.
 

 I think this is a case where the interest of justice definitely calls for impeachment to be permitted.
 

 I’ve read all the arguments on both sides. I’ve been going with the defense all along on this, but now I feel that the interests of justice require that this be an exception and that it be permitted. I’m going to permit it.
 

 I find it difficult to imagine a stronger case for letting it in. I wouldn’t let it in unless I thought it was a very strong case and that the probative value definitely exceeds any prejudicial effect.
 

 Bensimon’s counsel immediately objected, arguing that Bensimon would not have testified had he known the district court would admit his prior conviction. Counsel moved for a mistrial, but the district court denied the motion, stating “by putting your client on the stand, you ran that risk.”
 

 A.
 
 Rule 609(b)
 

 Bensimon argues on appeal that the district court erred under Rule 609(b) because it improperly balanced probative value and prejudicial effect. We review for abuse of discretion a district court’s decision to admit evidence of a prior conviction under Rule 609(b).
 
 See United States v. Vgeri,
 
 51 F.3d 876, 880 (9th Cir.1995). A district court’s interpretation of the Federal Rules of Evidence is reviewed
 
 de novo. See id.
 

 Rule 609(b) provides that a conviction more than ten years old is not admissible as impeachment evidence “unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances
 
 substantially outweighs
 
 its prejudicial effect.” Fed.R.Evid. 609(b) (emphasis added). Under Rule 609(b), the government must present evidence upon which the district court can make this determination.
 
 See United States v. Portillo (“Portillo
 
 I”), 633 F.2d 1313, 1323 (9th Cir.1980). Furthermore, the district court must make findings of specific facts and circumstances on the record to support the introduction of the prior conviction.
 
 See id.; United States v. Portillo (“Portillo II”),
 
 699 F.2d 461, 464 (9th Cir.1982).
 

 As required by
 
 Portillo II,
 
 the district court attempted to provide “specific facts and circumstances” to support its
 
 *1126
 
 decision to admit Bensimon’s seventeen-year-old mail fraud conviction. Specifically, the court based its ruling on Bensi-mon’s portrayal of himself as a law-abiding citizen, his evasiveness on cross-examination, and the fact that Bensimon’s credibility was a central issue in the case. The court’s explanation, however, falls short for several reasons.
 

 1.Misreading Bensimon’s Testimony
 

 First, we hold that the district court reads too much into Bensimon’s direct testimony. Bensimon’s statements that he was a “a husband, father, religious Jew, Army veteran, [and] successful businessman” were all made in passing, and did not amount to an attempt by Bensimon to misrepresent himself as having been a model citizen all of his life — the suggested criterion that the district court indicated would justify admission of the seventeen-year-old conviction. In fact, we can find in the record no testimony where Bensimon portrays himself to be a “law-abiding” citizen, much less that he testified he had always been law-abiding.
 
 [2]
 

 2.Reliance on Bensimon’s Lack of Memory
 

 Second, Bensimon’s inability to remember his recent travels or his income in recent years does not lend support to admitting the prior conviction. If anything, such testimony would cut against admission because Bensimon’s inability to remember these recent events was itself useful impeachment evidence for the government.
 

 3.“Centrality of Credibility”
 

 Finally, we hold that the district court improperly relied on the importance of Bensimon’s credibility to the government’s case. It is true, as the government argues, that this and - other courts have held that the probative value of impeachment evidence is enhanced where- the defendant’s testimony is pitted against that of the government witnesses, thereby making the credibility of the defendant,an important issue.
 
 See United States v. Murray,
 
 751 F.2d 1528, 1538 (9th Cir.1985);
 
 [3]
 

 see also United States v. Payton,
 
 159 F.3d 49, 57-58 (2d Cir.1998);
 
 United States v. Pritchard,
 
 973 F.2d 905, 908-09 (11th Cir.1992);
 
 United States v. Brown,
 
 956 F.2d 782, 787 (8th Cir.1992);
 
 United States v. Brown,
 
 603 F.2d 1022, 1028-29 (1st Cir.1979).
 

 More recently, however, this court held that the probative value of - a prior conviction may
 
 not
 
 be determined by how important the defendant’s credibility is to the opposing party. In
 
 American Home
 
 As
 
 surance Co. v. American President Lines, Ltd.,
 
 44 F.3d 774 (9th Cir.1994), we stated:
 

 [The appellant] argues that, in determining the probative value of his conviction, we should consider how critical [the witness’s] credibility was to their case. This argument misconstrues the yardstick by which probative value is measured. Probative value is determined by how likely the evidence is to prove some fact, not how important proof of that fact is to the proponent’s case. Accordingly, the probative value of [the witness’s] conviction is measured by how well it demonstrates his lack of trustworthiness, not how badly [the opposing party] wants to impeach him.
 

 Id.
 
 at 779. Such a reading is consistent with the advisory committee notes to Rule 609(b), which clearly state • “that convictions over 10 years old will be admitted
 
 very rarely and only in exceptional circumstances.”
 
 Fed.R.Evid. 609(b) advisory committee’s, note (emphasis added). The intended scope of Rule, 609(b) would be
 
 *1127
 
 defeated if a defendant could be impeached with a stale, prior conviction every time his story differed materially from that of government witnesses.
 

 . In this case, given Bensimon’s testimony, we find that the probative value of a seventeen-year-old conviction was very low. Bensimon did not testify that he had always been a law-abiding citizen or lead the jury to believe that he had not committed any crimes in the past. He simply did not address the issue. Further, while Bensimon’s credibility was certainly an important issue to the government’s case, this fact does not change the probative value of Bensimon’s seventeen-year-old conviction for mail fraud.
 

 B.
 
 Changed In Limine Ruling
 

 In weighing the prejudicial effect of the admission of Bensimon’s prior conviction, we next consider Bensimon’s argument that the court abused its discretion when it changed its in limine ruling despite its pretrial assurances that it would be very unlikely for the court to admit Bensimon’s prior conviction under Rule 609(b), and that the change in ruling prejudiced him.
 

 It is true, as the government argues, that a defendant is not entitled to a definitive ruling on a motion in limine. The Supreme Court- has recognized that a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court.
 
 See Luce v. United States,
 
 469 U.S. 38, 41-42, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The district court may change its ruling at trial because testimony may bring facts to the district court’s attention that it did not anticipate at the time of its initial ruling.
 
 See id.
 

 Still, parties expect a district court to adhere to its earlier ruling if no facts or circumstances arise to warrant a reversal. With respect to Rule 609(b), convictions older than ten years are inadmissible “unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a .fair opportunity to contest the use pf such evidence.” Fed. R.Evid. 609(b). This notice requirement allows parties to formulate trial strategies based upon a court’s preliminary ruling.
 

 Thus, we hold that in conducting the requisite Rule 609(b) balancing, the district court must consider any prejudice that will accrue to the defendant as a result of the court’s reversal of an earlier in limine ruling. This approach has been adopted by several other circuits.
 
 See United States v. Cardascia,
 
 951 F.2d 474, 489 (2d Cir.1991);
 
 Swietlowich v. County of Bucks,
 
 610 F.2d 1157, 1164 (3d Cir.1979);
 
 see also United States v. Yannott,
 
 42 F.3d 999, 1007 (6th Cir.1994) (holding “that the district court may change its ruling on a motion in limine where sufficient facts have developed to warrant the change”). We believe that such consideration of the prejudice a defendant might suffer as a result of a reversed ruling is consistent with the language and purpose of Rule 609(b).
 

 As stated in the previous discussion, Bensimon’s testimony did not result in facts or circumstances warranting impeachment with his prior conviction. Further, Bensimon’s counsel indicated both before trial and in his objection to the court’s ruling that Bensimon would not have testified had he known the court would admit his prior mail fraud conviction.
 

 Given the low probative value of Bensi-mon’s seventeen-year-old conviction and the added prejudice from the district court’s reversal of its earlier ruling, we find that the district court erred in concluding that the probative value of the conviction substantially outweighed its prejudicial effect. Further, as evidenced by the acquittal of his co-defendant Kogan who did not testify, we cannot say that the error was harmless.
 
 [4]
 

 
 *1128
 
 II.
 
 Remaining Issues
 

 Bensimon raises several other issues in asking us to grant him a new trial. Because these same issues will likely reappear in Bensimon’s retrial, we briefly address them here.
 

 A.
 
 Restriction of Cross-examination
 

 Bensimon argues that the district, court erred in restricting the cross-examination of Agents Walsh and McMillan on the procedures used when searching Bensi-mon’s vehicle. Specifically, he argues that a central issue to his defense was that the incriminating documents retrieved from his vehicle were not found in the leather briefcase, but were actually contained in the DHL envelope belonging to Saleh. Bensimon asserts that he was entitled to cross-examine both agents to establish that their procedures were sloppy, and that they actually did not know where those incriminating documents were found.
 

 This court reviews
 
 de novo
 
 whether the limitation on cross-examination violated Bensimon’s right of confrontation.
 
 See United States v. Marbella,
 
 73 F.3d 1508, 1513 (9th Cir.1996). The district court, however, has considerable discretion in restricting cross-examination, and this court -will find error only when that discretion has been abused.
 
 See United States v. Jenkins,
 
 884 F.2d 433, 435-36 (9th Cir.1989). A limitation on cross-examination “does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant,”
 
 United States v. Shabani,
 
 48 F.3d 401, 403 (9th Cir.1995), and denies the jury “ ‘sufficient information to appraise the biases and motivations of the witness.’”
 
 Jenkins,
 
 884 F.2d at 436 (quoting
 
 United States v. McClintock,
 
 748 F.2d 1278, 1290 (9th Cir.1984)).
 

 The limitations placed on Bensi-mon’s cross-examination of Agent Walsh may have been too restrictive. Whether the documents at issue came from the briefcase, which belonged to Bensimon, or from the DHL envelope, whose contents’ ownership was less clear, was an important and disputed issue. Walsh’s recollection of which documents came from which source was surely relevant here. The district judge restricted the cross-examination because he felt that Bensimon was “putting the investigators on trial.” If a line of cross-examination is relevant, however, it must be allowed even if it reflects poorly on a witness, whether that witness is a parish priest or a convicted felon.
 

 Regarding Agent McMillan, the court permitted counsel to cross-examine the agent about his failure to photograph Bensimon’s vehicle during the search. After counsel asked several more questions about what else McMillan had failed to photograph, the court asked McMillan if he had a camera, to which McMillan answered “no.” The court then stated, “we know he didn’t photograph anything. Let’s get on to something else.” Once the court determined that McMillan did not bring a camera, further questions on what was
 
 not
 
 photographed would have been cumulative.
 

 The limitations on the scope of Bensi-mon’s cross-examination of Agent Walsh may have'been overly restrictive, but those on Bensimon’s cross-examination' of Agent McMillan were appropriate.'
 

 B.
 
 Evidence of Bensimon’s Uncharged Fraudulent Conduct
 

 Bensimon argues that the government improperly introduced evidence that he filed for bankruptcy in 1996 and that he used an illegally cloned cellular telephone. This court reviews evidentiary rulings for an abuse of discretion.
 
 See United States v. Iverson,
 
 162 F.3d 1015, 1026 (9th Cir.1998);
 
 United States v. Serang,
 
 156 F.3d 910, 915 (9th Cir.),
 
 cert. denied,
 
 — U.S. —, 119 S.Ct. 627, 142 L.Ed.2d 565 (1998).
 

 1.
 
 Bankruptcy Records
 

 Bensimon argues that the district court abused its discretion when it admitted Bensimon’s 1996 bankruptcy petition un
 
 *1129
 
 der Federal Rule of Evidence 404(b) as evidence of Bensimon’s financial motive for committing the drug crimes. The court admitted the entire petition rather than the mere fact that Bensimon had filed for bankruptcy because it determined that the amount of debt was relevant. Bensimon also argues that in contravention of the district court’s ruling, the prosecutor used this evidence to argue that Bensimon had committed bankruptcy fraud, which was an improper propensity argument under Rule 404(b).
 

 This court recently addressed the issue whether evidence of poverty or poor financial condition is admissible to prove motive. In
 
 United States v. Mitchell,
 
 172 F.3d 1104 (9th Cir.1999), the defendant was convicted of bank robbery, and at trial, the prosecution offered evidence that the defendant was poor to prove the defendant’s motive to commit the bank robbery. In reversing the conviction, the court stated that
 

 [p]overty as proof of motive has in many cases little tendency to make theft more probable. Lack of money gives a person an interest in having more. But so does desire for money, without poverty. A rich man’s greed is as much a motive to steal as a poor man’s poverty. Proof of either, without more, is likely to amount to a great deal of unfair prejudice with little probative value.
 

 Id.
 
 at 1108-09. The court held that evidence of poverty or poor financial condition is inadmissible to prove motive where it is offered to show “the mere fact that the defendant is poor.”
 
 Id.
 
 at 1109 (quoting
 
 United States v. Jackson,
 
 882 F.2d 1444, 1449 (9th Cir.1989)). To be admissible, the court stated that the poverty evidence must be accompanied by something more, such as an “unexplained, abrupt change in circumstances.”
 
 Id.
 
 at 1108-09. Our cases suggest that poverty evidence may also be admissible if accompanied by evidence of a specific and immediate financial need.
 
 See Jackson,
 
 882 F.2d at 1453 (Reinhardt, J., dissenting);
 
 see also id.
 
 at 1450 (opinion) (noting that “poverty alone does not indicate a motive to commit, or the commission of, a crime”).
 

 Whether a petition for bankruptcy on its own constitutes evidence of a specific and immediate financial need has been addressed by the Eleventh Circuit. In
 
 United States v. Reed,
 
 700 F.2d 638 (11th Cir.1983), the court found that “the mere fact that a defendant is in Chapter XIII bankruptcy in no way demonstrates that the defendant had a particular need for money at the time the crime was committed. In fact, an individual enters bankruptcy for the purpose of having his debts discharged and thereby relieving the pressure which might compel him or her to commit a criminal act.”
 
 Id.
 
 at 643. The court held that “it would be impermissible for a jury to assume that the mere status of the appellant as a bankrupt is relevant to showing that he had a motive to embezzle checkletters.”
 
 Id.
 
 Adopting the Eleventh Circuit’s sound logic, we hold that a petition for bankruptcy is not in and of itself evidence of a specific and immediate financial need such that it would be relevant to showing Bensimon’s motive.
 

 The district court admitted the bankruptcy evidence for a second purpose: to show that Bensimon was trying to assume the identity of “Hussein Saleh.” The supposed connection was that both the “real” Hussein Saleh and Bensimon owned property in Modoc County, but Bensimon omitted his property from the bankruptcy petition. The government argued that this showed that Bensimon was trying to start anew after bankruptcy by assuming the identity of Saleh. The district court expressed confusion as to the relevance of this evidence, but eventually allowed it in the absence of any showing that it was prejudicial.
 

 The district court overlooked the prejudice that may occur when the prosecution in a criminal case is allowed to introduce evidence of a prior illegal, fraudulent act by the defendant. Once such tenuous evidence is in, the temptation to argue the irrelevant can be irresistible. In this case,
 
 *1130
 
 the prosecutor argued in closing: “[A]s I’ve mentioned, up to the time at least of Defendant Bensimon’s arrest, he is shielding the California Pines land from the purview of the courts.... ” This statement has little bearing on whether Bensi-mon tried to assume Saleh’s identity, but may well have had a prejudicial effect. Although Bensimon objected under Rule 403 to the admission of the bankruptcy evidence at trial, he fails to raise that argument on appeal. Because we have reversed and a new trial may ensue, we note that given its limited probative value and its likely prejudicial effect, the bankruptcy evidence should likely have been excluded under Federal Rule of Evidence 403.
 

 2.
 
 Cloned Cellular Phone Evidence
 

 The district court found that evidence that a cloned cellular phone was found in Bensimon’s vehicle was relevant to whether he imported the drugs. Bensimon argues that the government offered evidence of Bensimon’s use of an illegally cloned cellular phone subject to a later offer of expert testimony that such phones are used in the narcotics trade, but that the government never proved that purpose. As such, he argues that the evidence merely showed that Bensimon had engaged in defrauding the phone company, and the evidence should have been excluded under Rule 404(b).
 

 Bensimon’s argument that the government never satisfied its offer of proof has no merit. The government offered the testimony of a cellular phone fraud expert, who testified that one of the advantages of using a cloned cellular phone is that the calls are impossible to trace to a single person. Later, the government offered the testimony of its drug expert, who testified that cloned cellular phones are common tools of drug traffickers mainly because of their inability to be traced. The district court did not abuse its discretion in admitting the cloned cellular phone evidence.
 
 [5]
 

 CONCLUSION
 

 Judgment REVERSED and REMANDED, with instructions to order a new trial.
 

 [1]
 

 . "DHL" is an express shipping company similar to Federal Express.
 

 [2]
 

 . On the contrary, Bensimon admitted on direct examination that he knowingly purchased and used an illegally cloned cellular telephone.
 

 [3]
 

 .
 
 Murray
 
 is distinguishable in several respects. The court noted that defense counsel was allowed wide latitude in seeking to impeach the chief prosecution witness. 751 F.2d at 1533. Further, th'e subject of admitting the prior conviction was not tentatively ruled on in a pretrial motion, which is discussed more fully in section I.B
 
 infra.
 

 [4]
 

 . Bensimon also argues that the district court's failure to provide the jury
 
 sua sponte
 
 with a limiting instruction was plain error. We need not reach this issue because we reverse the district court’s admission of the seventeen-year-old mail fraud conviction.
 

 [5]
 

 . Bensimon also presents on appeal several other errors committed at trial and sentencing. Because these issues are not likely to reappear at Bensimon's retrial, we do not reach the merits of those claims.