**Opinion issued December 28, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00571-CR

———————————

**DANNY CARLTON FISHER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Case No. 1241361**

---

## MEMORANDUM OPINION

A jury found appellant, Danny Carlton Fisher, guilty of the offense of

criminal mischief.[1]   The trial court, pursuant to an agreed punishment

---

[1]   *See* TEX. PENAL CODE ANN. § 28.03 (West 2011).

recommendation from the State, assessed appellant's punishment at confinement for two years, suspended the sentence, placed appellant on community supervision for four years, and ordered that he pay $12,264.72 in restitution. In two issues, appellant contends that the evidence is legally insufficient to support his conviction and he received ineffective assistance of counsel.

We affirm.

## Background

Deborah Currier, the complainant, testified that in 2006, she lived in a house with her two children in Kingwood, Texas. The home had a detached garage apartment, which, on August 19, 2006, Currier leased to appellant for $750 per month, including utilities. The apartment had in it a refrigerator, a stove, a "small dinette," a small table, two chairs, a loveseat, a television stand, a small dresser, and some "decorative items." The complainant provided appellant with a key to the deadbolt lock on the door of the apartment and a key to her house because she allowed him to use her washer and dryer. The only other person who had a key to the deadbolt lock on the door of the apartment was Elias Currier, the complainant's ex-husband and "best friend," who would occasionally perform maintenance on the apartment. At first, appellant seemed "very cordial" and "friendly," and the complainant became "well-acquainted" with him.

The complainant explained that appellant was employed as a flower delivery driver, so his work was "seasonal" and "holiday-oriented." However, three or four months after he had moved in, appellant "hardly ever left" the apartment. Because appellant's air conditioning unit was "continually running," the complainant noticed an increase in her electricity bill. As a result, in January 2008, she informed appellant that because "he was now working from home" and she "didn't lease the apartment for him to run a business out of," she was raising the rent from $750 per month to $900 per month, effective February 15, 2008. Appellant seemed "upset" at the increase in rent and said that he "needed time to think about it."

On the morning of February 11, 2008, the complainant knocked on the door of the apartment to ask appellant if he was planning to remain. After she had repeatedly knocked on the door, appellant answered by "crack[ing]" the door open slightly and briefly stating that he did plan to remain at the apartment. When the complainant returned home from work that evening, she saw that appellant's car was gone. And it was still missing when she awoke the following morning. The complainant then knocked on appellant's door but received no answer. She could not open the door because only appellant and Elias had a key to the deadbolt lock. She then telephoned Elias and asked him to "do a courtesy check" to "see if [appellant] was there or if he had moved out without [her] noticing."

When the complainant returned home from work, she discovered that the apartment had been "trashed" and the walls "sprayed with urine and feces," mostly in the bathroom and the kitchen. She also noted that appellant's computer and most of his clothes were missing, but he had left his bed and television. The complainant opined that the damage to the apartment must "have taken place over a period of days." She noted that appellant never returned to pick up his remaining clothing, his mail, or pay the rent that was due on February 15, 2008.

The complainant filed a police report and "repeatedly" tried to call appellant on his cellular telephone, but he did not answer. She had to bring in a "specialized crew to clean the walls." And, to repair the apartment, she had to put in new carpet, repaint the walls, fix the appliances, and purchase and install a new toilet, new lights, and a new ceiling fan. In total, it cost the complainant "over $10,000" to repair the damage done to the apartment. The State introduced into evidence several receipts from purchases that the complainant had made in the effort to repair the apartment. For example, the purchases included a $219 receipt for plumbing repairs and materials, a $117.17 receipt for stove repairs and materials, and a $675 receipt for replacing the carpet. On cross-examination, the complainant testified that "a large amount of what it cost . . . to make those repairs is actually what [Elias] invoiced for his labor" and "materials."

Elias testified that on February 12, 2008, the complainant telephoned him and asked him to see if appellant had moved out of her apartment. When he arrived at the apartment at approximately 10:00 a.m, Elias noted that there were no "forced signs of a break-in," the deadbolt on the door was still secure, and all of the windows were secure. As he opened the door, Elias immediately smelled a "putrid" odor of "ammonia and feces," and he saw that all of the light bulbs in the apartment had been broken. He then called the complainant to report the damage, which he described as "extensive," although he did not call for police assistance because he was not the property owner. Elias also noticed that appellant's computer was no longer in the apartment and his clothing was "completely gone except for some things that weren't wearable."

The State then introduced into evidence several photographs depicting the damage done to the apartment. From the photographs, Elias identified "3M spray-on adhesive" spread across the front door and the walls. In the bedroom closet, Elias identified the phrase, "You suck," written on both the wall and closet door in "dried feces." And he noted "butter or grease" spread along the wall, a "combination of urine and feces" staining the carpet, and "dried urine" running down the walls in the kitchen. The phrase, "You suck," was also written in dried feces in the kitchen. Elias also identified urine and feces on the bedroom walls, on the bathroom walls, in the shower, on the stove, and under the kitchen sink. The

5

freezer was filled with water and frozen shut. The air conditioning unit was sprayed with the adhesive and "completely sealed." And the toilet had been "jammed with towels" and contained "glass and other objects."

To repair the damage done to the apartment, Elias had the walls cleaned and replaced the carpet, cabinetry, doors, and appliances. The State introduced into evidence the records that Elias had kept itemizing the costs, totaling $7,375, which he had incurred for labor and materials in repairing the apartment. Although he "didn't really break it down piece by piece," Elias explained that he had to "cut out" the underlying sheetrock on the walls where feces or urine had been spread, which cost him $1,600. He also estimated that it had cost him $1,500 to repair the toilet and plumbing. On cross-examination, Elias testified that he had still not been paid for the repairs.

Houston Police Department ("HPD") Officer S. McDonald testified that he was dispatched to the apartment on February 12, 2008. He noted that the apartment was "one of the worst" damaged apartments that he had "ever seen," with "products" and "chemicals" poured "all over every room" and "every piece of furniture" and "feces smeared on the wall as well as urine." McDonald noted that there was no evidence of forced entry into the apartment.

HPD Sergeant L. Brown testified that in 2008, she was assigned to investigate the damage done to the apartment. She spoke with the complainant less

6

than a month after the damage had been done and noted that the complainant was "very good at keeping and collecting her receipts for any repairs." Although Brown attempted to locate appellant, he was "nowhere to be found."

Appellant testified that in 2008, he ran his own "floral delivery service" and lived in the leased apartment adjoining the complainant's house. Around October 2007, appellant's business started struggling and it became "harder to meet [his] financial needs." In January 2008, the complainant informed him that she was going to increase his rent, and appellant replied that he had to "think about it." On January 15, 2008, appellant paid his rent through February and gave the complainant a "written notice of [his] intent to move out."

On January 18, 2008, appellant moved into a three-bedroom trailer in Tomball with his friend, Jeremy Webb. He moved his clothing, computer, "business records," and stereo into Webb's trailer. And he left his keys to the complainant's apartment on a dining table in the apartment and never returned to the apartment.

In regard to the photographs taken of the damage done to the complainant's apartment, appellant explained that the clothes in the bedroom closet did not belong to him. And, in two photographs, appellant noted that a bucket in the photographs appeared to have been moved. He also explained that he had been previously diagnosed as "bipolar," and he took medication. He denied damaging

7

the complainant's apartment or having received any telephone calls from the complainant regarding the damage done to the apartment.

On cross-examination, appellant admitted that he never contacted the complainant about receiving his deposit back or updated his address with the postal service. He also admitted that a copy of his notice of his intent to move out of the apartment, which had been admitted into evidence, was printed from his computer, and there was no "way to determine" when it was created.

Webb, a friend of appellant since 1979, testified that in January 2008, appellant, while watching a football game in Webb's trailer, mentioned that he was looking for a "cheaper place to live." On January 18, 2008, appellant moved into Webb's trailer, agreeing to pay $75 per week to "help towards food mainly." Appellant was "very consistent" in spending most of his time at the trailer, and Webb did not remember appellant ever spending a significant amount of time at another location. Appellant then moved out of Webb's trailer in May 2008. On cross-examination, Webb testified that in January and February of 2008, he was at work "maybe sixty hours a week" instead of at the trailer, so he could not testify as to appellant's whereabouts during that time.

After the jury found him guilty, appellant timely filed a motion for a new trial, contending that he had received ineffective assistance of counsel at trial. Specifically, appellant asserted that his trial counsel (1) "did not adequately

8

prepare and investigate [the] case and mitigation issues"; (2) "failed to present an alibi defense although the alibi witness . . . was ready and willing to testify"; (3) "failed to file a Motion to Quash" the warrant to arrest appellant; (4) "failed to request an instructed verdict based on insufficiency of the evidence"; (5) "failed to object to testimony of a lay witness"; and (6) "failed to object and request a continuance after the State violated the Court's Discovery Order."

At the hearing on appellant's motion, Michael Renfro, appellant's trial counsel, testified that he had met with appellant at least six times before trial and spoken with him "enough time[s] where [Renfro] felt like [he] was adequately prepared for trial." Appellant had provided Renfro "with what he felt [were] reasons for [the complainant] to lie," namely, that she had filed for bankruptcy and had an insurance claim to fix the apartment denied. However, Renfro did not believe that the complainant's bankruptcy proceedings were "important or relevant" to the case. Appellant then showed Renfro documents that indicated that the complainant had filed a bankruptcy proceeding in 2006, which was dismissed in August 2008.

Renfro further testified that he received from the State a notice of impeachable offenses committed by HPD Detective M. Hamby, who had provided an affidavit in support of the warrant to arrest appellant. Renfro explained that he did not believe that Hamby would be called as a witness. And Renfro thought that

the allegations against Hamby, which involved "something about a tear gas bomb," had no relevance in regards to Hamby's credibility. Renfro also spoke with Karen Williams, a witness at trial who testified that appellant had an "excellent" reputation for "truth and veracity." Renfro explained that he believed Williams to be a "character witness as to [appellant's] truth and veracity." Although Williams could testify that appellant delivered flowers for her from February 11, 2008 to February 14, 2008, Renfro did not believe that "she would have made an alibi witness." He reasoned that because the damage to the complainant's apartment likely "occurred over some period of time," Williams simply could not provide an alibi for appellant. Renfro maintained that appellant's defense was always that he "was not living at that address on the date in question," not that his flower delivery business made it impossible to commit the offense. He also noted that appellant had never asserted that Williams could provide him an alibi. After the hearing, the trial court denied appellant's motion for new trial.

### Sufficiency of the Evidence

In his first issue, appellant argues that the evidence is legally insufficient to support his conviction because the State did not prove that appellant caused damage to the complainant's apartment in "the pecuniary amount charged in the indictment."

We review the legal sufficiency of the evidence by considering all of the evidence "in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

A person commits the offense of criminal mischief if, without the effective consent of the owner, he intentionally or knowingly damages or destroys the tangible property of the owner. *See* TEX. PENAL CODE ANN. § 28.03(a)(1) (West 2011). The offense is a state jail felony if the amount of pecuniary loss is $1,500 or more but less than $20,000. *Id.* § 28.03 (4)(A). If the property is destroyed, the amount of pecuniary loss is the fair market value of the property at the time and place of the destruction or the cost of replacing the property within a reasonable

11

time after the destruction. *Id.* § 28.06(a) (West 2011). If the property is damaged, the amount of pecuniary loss is the cost of repairing or restoring the damaged property within a reasonable time after the damage occurred. *Id.* § 28.06(b).

The value of pecuniary loss is a crucial element of the offense because it forms the basis of the punishment assessed. *Elomary v. State*, 796 S.W.2d 191, 192–93 (Tex. Crim. App. 1990); *Barnes v. State*, 248 S.W.3d 217, 220 (Tex. App.—Houston [1st Dist.] 2007, pet. struck). The State must establish the fair market value of the cost of repairing or restoring the damaged property. *See Elomary*, 796 S.W.2d at 194. However, expert testimony is not required to prove the cost of repairing or restoring damaged property. *See Holz v. State*, 320 S.W.3d 344, 350 (Tex. Crim. App. 2010).

Appellant first argues that the evidence is legally insufficient to support the jury's finding that appellant caused the damage to the complainant's apartment because the complainant "never saw [appellant] damage the apartment," but only "speculated that he must have done it."

At trial, the complainant testified that when she informed appellant that she was going to raise his rent, appellant "wasn't very happy" and seemed "upset." On February 11, 2008, she went to ask appellant if he was going to remain at the apartment with the increased rent, and he, after he "cracked" the door open, "brief[ly]" informed her that he would. Later that evening, however, the

12

complainant noticed that appellant's car was missing. And, when his car was still missing the next morning, she requested that Elias inspect the apartment to see if appellant had moved out. The apartment was fitted with a deadbolt lock, and only appellant and Elias had keys for it. When the complainant tried to access the apartment on the morning of February 12, the deadbolt was locked. Elias testified that when he arrived to investigate the apartment, there were no signs of a "break-in" and the front door and windows were "secure." Officer McDonald similarly testified that when he arrived later in the day, there appeared to be "no forced entry at all" into the apartment.

The complainant further testified that after she had discovered the damage done to the apartment, she attempted to call appellant on his cellular telephone for "a couple of days," but appellant did not answer her calls. Appellant also did not return to the apartment to collect the rest of his clothing or his bed, and he did not have his mail forwarded to a different address. Nor did he attempt to recover his deposit.

Appellant testified that he moved out of the apartment on January 18, 2008, did not return to the apartment, and did not cause the damage to the apartment. However, the jury, as fact-finder, was entitled to resolve conflicts in testimony in favor of the complainant. *See Williams*, 235 S.W.3d at 750. And, although appellant asserts that there was no direct evidence that he caused the damage to the

13

apartment, the jury could have reasonably inferred, from the circumstantial evidence outlined above that, he did. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) ("Evidence as to the identity of the perpetrator of an offense can be proved by direct or circumstantial evidence."); *Holland v. State*, No. 13-06-532-CR, 2008 WL 4723095, at *7 (Tex. App.—Corpus Christi Apr. 17, 2008, no pet.) (holding circumstantial evidence legally sufficient to support defendant's conviction for criminal mischief).

Appellant next argues that the evidence is legally insufficient to establish that the amount of pecuniary loss to the apartment exceeded $1,500 because "the record is wholly silent on . . . exactly what amount of money was the financial loss caused by [appellant's] alleged smearing feces on some unnamed property of [the complainant's]."

Here, the indictment alleged that appellant:

[O]n or about February 11, 2008, did then and there unlawfully, intentionally, and knowingly DAMAGE tangible property, namely AN APARTMENT, ONE TOILET, ONE CARPET, AND A FIXTURE, owned by [the complainant], . . . and the value of the pecuniary loss so inflicted was over one thousand five hundred dollars and under twenty thousand dollars, by FLOODING THE COMPLAINANT'S PROPERTY . . . CLOGGING THE COMPLAINANT'S TOILET WITH TOWELS . . . [and] SMEARING FECES ON THE COMPLAINANT'S PROPERTY.

At the charge conference, the State abandoned the allegation that appellant caused the damage by flooding the apartment. Thus, the State was required to prove that

14

appellant caused damage in a pecuniary amount of at least $1,500 by "clogging the complainant's toilet" and/or "smearing feces on the complainant's property."

Appellant asserts that the complainant "did not testify what areas were specifically smeared with feces." However, the complainant testified that feces had been "thrown or rubbed on the walls" in both the bathroom and the kitchen. And it was "all over the ceiling" and "all over the floor of the bathroom shower." She also testified that the words, "You suck," were written in feces on the closet door and "[t]here were towels and objects stuffed into the commode." Elias testified that the carpet was stained with a "[c]ombination of urine and feces" and the refrigerator was "smeared with feces." Although Officer McDonald testified to only seeing feces on the bathroom wall, he further testified that he "couldn't spend a lot of time in the house." He noted that there possibly could have been feces in other rooms of the apartment, but "the conditions were so deplorable and the smell was so bad, it would have taken a lot more time to go through to see that." And the jury was presented with photographic evidence of the damage to the apartment, which includes photographs of stains to the wall of the bathroom, kitchen, and carpet, and the words, "You suck," written in the closet.

The complainant testified that it cost her "over $10,000" to repair the damage, including Elias's work in replacing the carpeting, cleaning the walls, and fixing and replacing the appliances and fixtures. The State also introduced into

15

evidence several receipts, including a receipt for $900 to clean the apartment and a receipt for $675 to replace the carpeting. Elias, who identified himself as a "handyman" and carpenter, testified that he arranged to replace the carpet, clean the walls, and replace the toilet. The State also introduced into evidence an invoice that Elias had prepared documenting the cost of the labor and materials used in repairing the damage to the apartment. Elias testified that he had to "cut out" the sheetrock on some walls because "some of [the damage] couldn't be washed off or cleaned off"; his invoice showed a cost of $1,600 for "sheetrock – prep" including "cutting out damaged rock and contaminated rock." The invoice also included a cost of $825 for plumbing repairs, including "commode removal and installation, because of vandalism," and $1,050 for "painting, priming, and staining" the damaged sheetrock.

Viewing the evidence in the light most favorable to the jury's finding, the jury could have reasonably found that the complainant had to clean the entire apartment at a cost of $900, replace the carpeting at a cost of $675, "cut out" the sheetrock at a cost of $1,600, and repaint the damaged sheetrock at a cost of $1,050. *See Barnes v. State*, 248 S.W.3d 217, 221 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[A] complainant's testimony may be sufficient, without additional evidence, to support the pecuniary loss, or value, element of a conviction for criminal mischief."); *Kinkade v. State*, 787 S.W.2d 507, 508–10

16

(Tex. App.—Houston [1st Dist.] 1990, no pet.) (holding that, in criminal mischief conviction, expert testimony or reasonableness of cost of repairs not required because property owner is competent to testify as to costs to repair damage). Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction.

We overrule appellant's first issue.

## Ineffective Assistance of Counsel

In his second issue, appellant argues that he received ineffective assistance of counsel at trial because his counsel failed to (1) "adequately investigate and prepare" for trial; (2) "prepare and present alibi" evidence, specifically, the testimony of Williams; (3) file a motion to suppress his arrest warrant; (4) request an instructed verdict based on legally insufficient evidence; and (5) "introduce evidence of [the complainant's] grave financial situation to show motive to lie."

Appellant presented his ineffective assistance claim to the trial court in a motion for new trial and received a hearing on his motion. We therefore analyze his second issue as a challenge to the denial of the motion for new trial. *Biagas v. State*, 177 S.W.3d 161, 170 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). We do not substitute our

17

judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Biagas*, 177 S.W.3d at 170. A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb*, 232 S.W.3d at 112.

In order to prove an ineffective assistance of counsel claim, appellant must show that his trial counsel's performance fell below an objective standard of reasonableness and, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that his performance falls within the wide range of reasonable professional assistance or trial strategy. *Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). A failure to make a showing under either prong defeats a claim of ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003).

18

Appellant first argues that his trial counsel failed to "adequately investigate and prepare" for trial and "prepare and present alibi" evidence because Williams's testimony "would have been able to place [a]ppellant away from home" for long enough that committing the offense "would be impossible time-wise."

At the hearing on the motion for new trial, Renfro testified that he met with appellant on "at least half a dozen" occasions before trial and he spoke with appellant for "enough time where [he] felt like [he] was adequately prepared for trial." Renfro requested that appellant provide him with "names, addresses, and phone numbers" of potential witnesses. Appellant testified that he gave Renfro the names and addresses of three witnesses: Webb, Williams, and appellant's father. Webb and Williams both testified at trial, and appellant fails to articulate what evidence Renfro failed to uncover in his investigation. *See Joseph v. State*, 367 S.W.3d 741, 744 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) ("The reasonableness of an attorney's investigation may turn on information supplied to him by a defendant.") (citing *Bryant v. Scott*, 28 F.3d 1411, 1414 (5th Cir. 1994)).

In regard to Williams's testimony, Renfro admitted that he received a letter from her stating, in part,

> This is to certify that I am the owner of Rain Forest Flowers. Danny Fisher works for me on holidays on a contract basis. Consequently, he worked for me on February 11, 12, 13 & 14, 2008 delivering flowers. This is a florist['s] busiest time of year and I have been depending on [appellant] for the last five years to assist me and my

19

drivers in getting all our Valentines Day deliveries for our clients delivered on time.

[Appellant] is known to me and all my contract employees as a professional, courteous delivery driver. Additionally, he is . . . kind, caring and concerned regarding others. I witnessed at one time, while working for me, [my] lead designer dropped a knife on her foot and hit a vein. [Appellant], due to his medic training while in the military, knew exactly how to handle the situation and did it in a timely manner with a great deal of concern.

At the hearing, Williams testified that appellant was also working at her flower shop on February 9 and 10 for "eight to ten hours" per day because it was the weekend before Valentine's Day.

Renfro explained that appellant presented Williams as "a good character witness for us to establish the fact that he is a person of truth and veracity in the community he resides." Appellant insisted to Renfro that his defense was that he "was not living at that address on the date in question," not that his flower delivery business made it impossible to commit the offense. Renfro also noted that the damage done to the apartment had to have occurred, at least partially, before the dates mentioned in Williams's letter. Thus, Renfro wanted to focus the jury's attention on appellant's primary defense that he had moved out of the complainant's apartment before the damage was done and had left his key in the apartment. Thus, Renfro could have reasonably considered Williams as only a character witness and not an alibi witness. *See Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd) ("[T]he decision whether

to present witnesses is largely a matter of trial strategy."); *Rodd v. State*, 886 S.W.2d 381, 384 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

In regard to Renfro's not filing a motion to suppress appellant's arrest warrant, appellant asserts that the State gave Renfro notice that Detective M. Hamby, the affiant on the affidavit supporting probable cause, was "on suspension for an investigation relating to a tear gas bomb at the rodeo." Appellant also notes "contradictions or errors" in Hamby's affidavit supporting probable cause, such as identifying the complainant as Deborah "Carrier" and reporting that the apartment was "flooded." However, appellant fails to identify any evidence recovered pursuant to the execution of the arrest warrant. *See Blondett v. State*, 921 S.W.2d 469, 473 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (holding that trial court did not err in denying motion to suppress arrest warrant because no evidence was obtained from the arrest).

In regard to Renfro's alleged failure "to request [an] instructed verdict based on insufficient evidence," appellant asserts that there "was no evidence at trial how much the damage was to repair or replace any of the items specifically due to clogging the toilet or smearing feces." However, the failure to move for an instructed verdict cannot provide the basis for a claim of ineffective assistance of counsel if the State produced more than a scintilla of evidence supporting a guilty verdict. *Gill v. State*, 111 S.W.3d 211, 217 (Tex. App.—Texarkana 2003, no pet.).

Having already held that the evidence is legally sufficient to support appellant's conviction, we conclude that appellant has not shown that Renfro was deficient in not moving for an instructed verdict. *See Wyatt v. State*, No. 14-10-00872-CR, 2011 WL 2120118, at *9 (Tex. App.—Houston [14th Dist.] May 24, 2011, pet. ref'd) (mem. op.) (holding that, because legally sufficient evidence supported defendant's conviction, defendant did not show that the trial court would have erred in denying any motion for instructed verdict).

In regard to Renfro's alleged failure to "introduce evidence of [the complainant's] grave financial situation and motive to lie," appellant asserts that Renfro did not produce evidence that the complainant "tried to get insurance money for the damage, but was denied" and she "was in a pending personal bankruptcy case at the time of this event." However, the jury did hear testimony relating to the complainant's denied insurance claim for the damage done to her apartment. The complainant testified that although she "maintained insurance on the entire property," her insurance claim was denied. She explained that the insurance company "did not assume any liability" for the damage because the complainant "knew who had vandalized" the apartment and had already "pressed the charges." She reiterated this testimony on cross-examination as well. At the hearing on the motion for new trial, appellant admitted that the jury heard that appellant's insurance claim was denied. And, in closing argument, Renfro again

22

argued that the complainant accused appellant of causing the damage "because an insurance claim was denied."

Regarding the bankruptcy evidence, appellant, at the hearing on his motion for new trial, testified that he provided Renfro "bankruptcy records and bankruptcy information about [the complainant]." He believed that the trial strategy should have been to show "why [the complainant] needed the money, which would be the bankruptcy and the insurance claim." Appellant also presented Renfro with documents "showing that the complainant in this case [had] filed for bankruptcy" in 2006 and the proceeding was dismissed in August 2008.[2] Renfro testified that he did not believe the bankruptcy proceeding "to be important or relevant to the facts of his case." Given the strong presumption that trial counsel's performance was reasonable, the vague information regarding the bankruptcy proceedings provided to Renfro, and the fact that Renfro did introduce evidence regarding the complainant's denied insurance claim, we cannot conclude that his decision not to present evidence regarding the complainant's bankruptcy proceedings was outside the realm of reasonable trial strategy. *See Thompson*, 9 S.W.3d at 813; *see also Martin v. State*, 265 S.W.3d 435, 441 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that failure to investigate does not constitute ineffective assistance of counsel unless "only viable defense available to the accused is not advanced").

---

[2]     Although it appears that the documents were admitted into the evidence at the hearing, they are not in the appellate record.

23

We also note that appellant has failed to demonstrate that the bankruptcy evidence would have been admissible. *Cf. United States v. Bensimon*, 172 F.3d 1121, 1128–29 (9th Cir. 1999) ("[A] petition for bankruptcy is not in and of itself evidence of a specific and immediate financial need such that it would be relevant to showing [defendant's] motive."); *Smith v. State*, No. 14-94-00452-CR, 1996 WL 224985, at *5 (Tex. App.—Houston [14th Dist.] May 2, 1996, pet. ref'd) (not designated for publication) ("Trial counsel cannot be ineffective for failing to offer inadmissible evidence.").

Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's motion for new trial on the ground that appellant received ineffective assistance of counsel at trial.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Do not publish. TEX. R. APP. P. 47.2(b).